UNITED STATES of America,
Plaintiff-Appellee,

v.

Alvin KLUPT and Purchasing Corporation of America, Defendants-Appellants.

Nos. 602, 603, Docket 72–2197, 72–2198.

United States Court of Appeals,
Second Circuit.

Argued Feb. 23, 1973.

Decided March 19, 1973.

Sidney A. Soltz, Miami, Fla., for appellants.

George W. F. Cook, U. S. Atty. for the District of Vermont (William B. Gray, Asst. U. S. Atty., on the brief), for appellee.

Before FEINBERG, MULLIGAN and TIMBERS, Circuit Judges.

FEINBERG, Circuit Judge:

Alvin Klupt and his controlled corporation, Purchasing Corporation of America, appeal from judgments of conviction, after a ten-day jury trial before Chief Judge James S. Holden in the United States District Court for the District of Vermont, on various counts charging fraudulent concealment of the assets of a bankrupt corporation, Fair Haven Slate Company, Inc., and related violations.[1] 18 U.S.C. §§ 2, 152, 153, 371, 2314, 2315. One of the ten counts in the indictment was dismissed. Klupt was sentenced to concurrent terms of one year in prison, but execution of that sentence was suspended, and he was placed on probation for two years; he was also fined $3,000. Purchasing Corporation was fined $1,500.[2]

Klupt acquired control of Fair Haven in early October 1970 after the company's principal creditor, Proctor Trust Company, had suggested that somebody be brought in "to salvage the business and keep it going." At the time, Fair Haven was in a precarious financial position; and Proctor, which had loaned the company about $310,000, of which $200,000 was still outstanding, hoped to keep the enterprise functioning by bringing in new management. Shortly after Klupt's takeover, Fair Haven petitioned for a Chapter XI arrangement and received permission to continue its business as a debtor in possession. Although not personally holding any of Fair Haven's stock,[3] Klupt directed its operations through its president, a business associate named Cutler, whom he had appointed. Cutler was named in the indictment as a co-conspirator, but not as a co-defendant, and was one of the principal witnesses for the Government at trial.

Before its acquisition by Klupt, Fair Haven had been factoring its accounts receivable with Proctor. Fair Haven

---

1. Counts one and two charged fraudulent concealment of assets from the bankrupt's creditors; counts three and four charged receipt and aiding and abetting receipt of property from a bankrupt for purposes of defeating the bankruptcy law; counts five and six charged transportation and aiding and abetting transportation in interstate commerce of converted securities; counts eight and nine alleged receipt and concealment and aiding and abetting such receipt and concealment of converted securities; and count ten charged a conspiracy to violate the bankruptcy law.

2. In view of the mildness of the sentences imposed, we withhold any comment as to the appropriateness, on the facts of this case, of a ten-count indictment.

3. A majority of Fair Haven's stock was distributed to Klupt's daughter and lesser amounts to the company's president and quarry manager. A qualifying share was also issued to Fair Haven's lawyer.

would submit to Proctor an invoice covering a shipment to a customer and would receive an advance of 70 per cent of the face value. The account receivable would be assigned to Proctor to cover the advance and an interest charge; when Fair Haven received payment from its customer, the company would transmit the assigned money to Proctor. In late October 1970, however, Proctor decided to discontinue this arrangement because of Fair Haven's weakened financial condition. The financing of the accounts was taken over, pursuant to bankruptcy court authorization, by Klupt's own company, defendant Purchasing Corporation. This arrangement continued until January 1971, when Proctor resumed the factoring of Fair Haven's accounts.

The actions that are the subject of the indictment took place in February and March of 1971. During this period Fair Haven received but failed to turn over to Proctor, allegedly on the order of Klupt, 11 checks that had been assigned to that company. Instead, seven of the checks, totalling $8,241.65, were retained by Fair Haven and deposited in its payroll account. The other four, worth $5,727.-95, were sent to Purchasing Corporation, which placed them in its own account in Miami, Florida. The proceeds of these four checks were soon returned to Fair Haven and deposited in the same payroll account except for $927.95, which Cutler placed in his own account. Subsequently, all the money was paid over to Proctor.[4]

Throughout the early months of 1971, the financial condition of Fair Haven worsened, and in early April an order was entered adjudging the company a bankrupt. During the subsequent bankruptcy proceedings, Proctor claimed $27,806.70 as money due for loans to Fair Haven secured by assignment of accounts receivable. The referee found the security interest on these claims invalid because Proctor had filed its financing statement in the wrong town. However, he also found that the loans were a proper expense of the administration of the debtor's estate.

At trial, the principal issue for the jury was the role of Klupt in the admitted diversion of checks. In testimony, Klupt denied any involvement other than unexpectedly receiving and promptly returning the four checks sent to Purchasing Corporation, and he claimed that Cutler had told him that the money had been sent by mistake. However, a number of witnesses reported that Klupt had stated to them in substance that he had ordered the diversion of all 11 checks in retaliation for the apparently inadvertent prior clearance by Proctor of two checks that had been sent to it but should have gone to Purchasing Corporation.[5] The jury obviously refused to accept Klupt's version of what had occurred.

Appellants' principal argument is based upon the finding of the bankruptcy referee that Proctor's lien on the accounts receivable was invalid. Appellants assert that because of this, Proctor was only a general creditor, that as a debtor in possession Fair Haven could use the receivables to pay for the operation of the business and that, therefore, depositing the checks in the company's payroll account did not constitute concealment under the statute.

■ This reasoning is manifestly inapplicable to the four checks sent to Purchasing Corporation, which are the subject of seven of the substantive counts

---

4. Because of this diversion of funds, Proctor again terminated its factoring of Fair Haven's accounts in March 1971.

5. Thus, for example, Bernard Dick, Fair Haven's court-appointed attorney, testified:

Well, [Klupt] said "they took my funds," and he said, "So, it is all right for me to take their funds," then he used, I can remember this favorite term, "hanky-panky,—if they are playing hanky-panky with my funds, I can play hanky-panky with their funds."

**1018**

in the indictment on which appellants were convicted. As to these, although appellants imply that the return of the money by Purchasing Corporation to Fair Haven purged them of criminal responsibility, this theory is simply without foundation. Cf. United States v. Diorio, 451 F.2d 21 (2nd Cir. 1971) (per curiam), cert. denied, 405 U.S. 955, 92 S.Ct. 1173, 31 L.Ed.2d 232 (1972). Therefore, as to the bulk of the substantive counts, appellants' violation was clear.

We turn then to the one remaining substantive count, which involves the seven checks deposited directly in Fair Haven's account and which does raise more difficult issues.[6] Although the referee ruled that Proctor, as against the later-appointed bankruptcy trustee, could not assert a lien on the accounts receivable because of the incorrect filing, the referee did not hold, as appellants suggest, that the assignment of receivables to Proctor was unauthorized and invalid. That Proctor, by reason of the referee's decision, was only a general creditor in the later bankruptcy liquidation is not controlling on the issue before us. The statute in question —18 U.S.C. § 152—covers in terms all creditors.[7] As a debtor in possession, Fair Haven could, as the bankruptcy referee found, finance its receivables by assigning them to Proctor. Once this was done, the deliberate and unrevealed diversion of the assigned checks to uses other than payment to Proctor permitted a finding of concealment. See 1 Collier on Bankruptcy ¶ 1.07, at 58 (14th

ed. 1971) (concealment includes "placing assets beyond the reach of creditors or withholding knowledge thereof by failure or refusal to divulge owed information"); 2 id. ¶ 29.05[2.2], [2.3]; cf. United States v. Zimmerman, 158 F.2d 559 (7th Cir. 1947) (failure to list assets on property schedule is concealment despite actual knowledge of assets by creditors and trustee). It is true that depositing the seven checks in the debtor's payroll account directly benefitted the debtor rather than Klupt, but this does not change the result. Cf. Duggins v. Heffron, 128 F.2d 546 (9th Cir. 1942) (absence of diminution of debtor's estate is not defense to claim of concealment); Kolesinski v. Mashey, 127 F.2d 528 (2nd Cir. 1942) (concealment need not be from all creditors). While these cases and the other authorities cited above are obviously not squarely on point —indeed we could find no case dealing with the precise issue raised here—the language of the statute, see note 7 supra, seems squarely to cover this situation. Compare with 18 U.S.C. § 153 ("Whoever knowingly and fraudulently appropriates to his own use . . . ."). Moreover, the failure to follow procedures that the bankruptcy court had authorized and prescribed was, in a basic sense, a fraud on the court as well as on the creditor.[8]

Appellants also argue that Judge Holden erred in refusing one requested charge and modifying another. The former would have required the jurors to acquit if they determined that the funds in question ultimately had been

---

6. The argument also applies to the conspiracy conviction, which involved all 11 checks.

7. Whoever knowingly and fraudulently conceals . . . from creditors in any bankruptcy proceeding, any property belonging to the estate of abankrupt . . . .

8. It is true that the bankruptcy court authorization for Fair Haven to assign its accounts named Purchasing Corporation

as the assignee and that the subsequent substitution of Proctor was not pursuant to a court order. However, as the referee observed:

This Court and all parties who attended the hearings within two months after the date of said Order [authorizing the assignment of accounts to Purchasing Corporation] were well aware that Proctor had been substituted for Purchasing and . . . this amounted to implied authority.

used to pay Fair Haven's other creditors. We have already indicated that it was not a defense that the seven checks initially deposited in Fair Haven's payroll account had been used to pay the debtor's employees or that Purchasing Corporation had ultimately returned to the debtor the proceeds of the other four checks. Therefore, such a charge would have been incorrect and was properly refused. The other proposed instruction stated that if the jurors found that the checks had been returned to Fair Haven's account, they "should" give this fact "great consideration" in deciding whether defendants had possessed the requisite criminal intent. In charging the jury, Judge Holden changed the word "should" to "may." While the return of the money might be relevant to a determination of defendants' initial intent, it did not necessarily reflect an absence of fraudulent purpose. Its probative value on that score was for the jury, not the judge, to weigh. The modification of the requested charge was not erroneous.

Appellants also claim that a mistrial should have been declared when the prosecutor stated in the presence of the jury that he was handing over to defense counsel the grand jury testimony of the next two witnesses; that, in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), defendants' attorney was not shown possibly exculpatory evidence in the Government's files; and that the prosecutor failed to make clear, when cross-examining Klupt's daughter, that some of his earlier questions to her had been based on allegedly prejudicial factual assumptions that he had since learned were incorrect. As to the first argument, while we do not approve of the practice followed here, see United States v. Gardin, 382 F.2d 601, 605 (2nd Cir. 1967), it does not call for reversal in this case. The second claim is without merit, and the third is de minimis.

Judgment affirmed.