UNITED STATES of America, Appellee,

v.

John A. GRANT, Defendant, Appellant.

No. 90–2193.

United States Court of Appeals,
First Circuit.

Heard Jan. 7, 1992.

Decided July 28, 1992.

David Kelston with whom Penny Kozol and Friedman & Atherton, Boston, Mass., were on brief for appellant.

Mark J. Balthazard, Sp. Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief for appellee.

Before BREYER, Chief Judge, BOWNES, Senior Circuit Judge, TORRUELLA, SELYA and CYR, Circuit Judges.

## OPINION EN BANC

CYR, Circuit Judge.

John A. Grant, a former chapter 7 debtor, appeals his felony conviction for concealing art work belonging to the chapter 7 estate, claiming that there was insufficient evidence to support the conviction and that the prosecutor made improper remarks during closing argument. A panel of this court initially vacated the judgment of conviction on the ground that the government had not established an essential element of

the crime of concealment, *see* 18 U.S.C. § 152 (1979 & Supp.1991), namely, that the art work "belonged" to the chapter 7 estate at the time of the alleged concealment. *United States v. Grant*, 946 F.2d 1 (1st Cir.1991) (withdrawn September 26, 1991). Upon rehearing *en banc*, we vacate the panel opinion and affirm the judgment of conviction.

I

## BACKGROUND

We relate the material facts in the light most favorable to the verdict. *United States v. Lopez*, 944 F.2d 33, 39 (1st Cir. 1991); *United States v. McNatt*, 813 F.2d 499, 502 (1st Cir.1987). Prior to 1987, Grant, a nonpracticing attorney, controlled five corporations [hereinafter "Summit"] which were engaged in providing financial and investment planning services. Between November 1983 and April 1986, Grant purchased at least nine remarqued maritime prints by artist John Stobart [hereinafter "Stobart prints"] from the Stobart Gallery in Boston, for between $1500 and $3000 each. Most of the invoices were signed by Grant, as the named "purchaser." [1]

During May 28, 1987, Grant initiated voluntary chapter 11 proceedings in his individual capacity and in behalf of Summit, which continued to operate as a debtor in possession. Grant scheduled "15 prints & photographs ... located at 92 State Street" as property of his own chapter 11 estate. On November 17, 1987, the chapter 11 proceedings relating to Grant and Summit were converted to chapter 7 liquidation proceedings. Grant learned of the court-ordered chapter 7 conversions the same day. Two days later, the newly-appointed chapter 7 trustee [hereinafter "trustee"] scheduled a November 20 meeting with Grant and Grant's counsel in Summit's offices at 92 State Street in Boston.

On the morning of November 20, the trustee, accompanied by Linda Young, Esquire, counsel to the chapter 11 creditors committee and the trustee, arrived at 92 State Street, where Young noticed that there were "significantly less and different furnishings" than she remembered from her visit one month earlier. Young informed the trustee that a "number of large prints" were missing and had been replaced with "inexpensive photographs." The trustee notified Grant and Grant's counsel that items may have been removed from the Summit offices, and asked that Grant accompany him to the Grant residence in Winchester, Massachusetts, to conduct an immediate inventory of its contents. The trustee rejected Grant's suggestion that the inventory be deferred for three days. When Grant misinformed the trustee that he had scheduled a meeting with another attorney "later that morning," the trustee arranged to meet Grant in Boston at 1:00 in the afternoon, at which time they were to proceed to the Grant residence and conduct the inventory. Young discussed with Grant and his attorney the legal consequences of the onset of the chapter 7 proceedings, informing Grant that he no longer had authority to conduct the Summit business and that the trustee was responsible for collecting and liquidating all assets of the chapter 7 estates. Their meeting at 92 State Street ended at approximately 10:30 a.m.

Upon leaving 92 State Street, and without informing the trustee of his plans, Grant took the train to Winchester and drove to his residence, arriving at approximately 11:40 a.m. When two former assistants arrived for a previously scheduled meeting with Grant, they saw him loading unidentified items into his van. At Grant's direction, the assistants packed office equipment and eight or nine framed items

---

**1.** In May 1986, an inventory reflected that 22 Stobart prints were located at the Summit business offices in Burlington, Massachusetts. After the business was beset by financial difficulties, Summit eventually relocated to smaller offices at 92 State Street in Boston. Sometime after the relocation, Grant stored at least two Stobart prints in the basement of the Grant residence at 18 Everett Avenue, Winchester, Massachusetts. In February 1987, a Summit employee forwarded a copy of the May 1986 inventory to Summit's insurer. The cover letter described the 22 Stobart prints as "art work owned by Mr. Grant." The least expensive print on the inventory was valued at $1200.

into their own vehicles. One assistant recognized the framed items as Stobart prints previously located at the Summit offices in Burlington. Grant drove his loaded van to the train station, parked it, and took the MBTA back to Boston to meet the trustee as previously arranged. Grant's assistants drove home with the Stobart prints in their vehicles. Meanwhile, a member of the former chapter 11 creditors committee had observed the removal of property from the Grant residence and notified the trustee, who contacted the FBI.

Immediately upon receiving the report of Grant's activities, the trustee and Linda Young drove to the Grant residence. Grant returned to Winchester by train, but decided to walk home from the train station rather than drive the loaded van. The FBI arrived shortly thereafter. When Grant was confronted with the report that he had been seen removing items from the residence, he admitted to removing files and office equipment but did not mention the Stobart prints. The trustee conducted an inventory of the contents of the Grant residence.[2] Notwithstanding Grant's testimony that he retrieved the removed items later that day, he never informed the trustee of their return. The indictment charged a continuing concealment, extending from November 20, 1987, through the date of indictment on March 20, 1990.

During the course of the chapter 7 proceedings, the trustee commenced several adversary proceedings against Grant and Grant's wife, who filed claims against the chapter 7 estates. One of these adversary proceedings involved an objection to Grant's discharge, based on the alleged concealment of an unspecified number of Stobart prints belonging to the jointly-administered chapter 7 estates. Grant,

Grant's wife, and the trustee entered into a settlement agreement in August 1989, whereby the trustee would release all claims relating to the adversary proceedings pending against the Grants and would abandon any interest, *inter alia*, in their Winchester residence, its contents, and furnishings, in return for a $250,000 cash payment arranged by Mrs. Grant. Six months later, Grant was indicted for allegedly concealing "at least six Stobart prints with an approximate value of $12,000." Following a three-day jury trial, Grant was convicted and sentenced to a twelve-month probationary term.

## II

## DISCUSSION

### A. Elements of Bankruptcy Fraud

The concealment offense with which Grant was charged under the indictment in this case required proof beyond a reasonable doubt that Grant knowingly concealed property of his chapter 7 estate from the chapter 7 trustee, with specific intent to defraud creditors. *See United States v. Guiliano*, 644 F.2d 85, 87 (2d Cir.1981) (Bankruptcy Act case).[3] Grant contends that the government failed to establish beyond a reasonable doubt that (1) the concealed Stobart prints were property of the chapter 7 estate, (2) Grant acted with the requisite specific intent to defraud creditors, and (3) the prints were of substantial value to the estate.

#### 1. Property of Chapter 7 Estate

##### a. Consequences of Abandonment and the "Relation Back" Doctrine

 Grant first contends that the government failed, as a matter of law, to

---

**2.** At trial, Grant introduced an auctioneer's valuation of the contents of the residence as of March 15, 1988, which reflected only two Stobart prints, entitled "Docks Awash" and "Robert E. Lee," valued at $50 apiece. On the Stobart Gallery price list, "Docks Awash" and "Robert E. Lee" were assigned a combined value of $3,600.

**3.** At trial, the district court read to the jury a condensed version of the applicable statute, which provides as follows:

Whoever knowingly and fraudulently conceals from a ... trustee ..., or from creditors

in any case under title 11, any property belonging to the estate of a debtor ... [s]hall be fined not more than $5,000 or imprisoned not more than five years, or both.

18 U.S.C. § 152, cl. 1 (1979 & Supp.1991). Section 152 was amended in October 1979 to reflect changes in terminology occasioned by the enactment of the Bankruptcy Reform Act of 1978. As the amendments are largely irrelevant to the issues raised on appeal, where appropriate we cite to authority antedating the 1979 amendment.

establish that the Stobart prints were "property belonging to the [chapter 7] estate." 18 U.S.C. § 152. Relying on the "relation back" doctrine developed under the Bankruptcy Act of 1867 (and its successor statutes) [hereinafter "Bankruptcy Act"], Grant contends that his conviction must be set aside in light of the trustee's post-concealment abandonment of the Stobart prints. According to Grant, the putative abandonment revested title in the same entity which held it at the commencement of the case and any interim concealment of the prints was nullified retroactively.[4]

As Grant's "relation back" claim is raised for the first time on appeal, we review for plain error, *see, e.g., United States v. Dietz*, 950 F.2d 50, 55 (1st Cir. 1991) (as a general rule, appellant may not "switch horses mid-stream" and raise new legal arguments not made the basis for objections in the district court), affording appellate relief only from " ' "particularly egregious errors" ... that "seriously affect the fairness, integrity or public reputation of judicial proceedings".' " *United States v. Griffin*, 818 F.2d 97, 100 (1st Cir.)

(quoting *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting *United States v. Frady*, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982))), *cert. denied*, 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987).[5] Assuming the trustee did abandon any interest of the chapter 7 estate in the Stobart prints allegedly concealed by Grant, a dubious proposition at best, *see supra* note 4, we conclude nonetheless that the doctrine of "relation back" is unavailing, as it is logically and legally inapposite to a criminal prosecution for concealing "property belonging to [a chapter 7] estate" arising under the Bankruptcy Code.

We note at the outset that the doctrine of "relation back" has been recognized in bankruptcy proceedings for more than a century, yet Grant has not cited to a criminal case in which the doctrine was applied. No less significantly, the doctrine originated within the very dissimilar framework of the Bankruptcy Act, and its application in relation to these chapter 7 proceedings under the Bankruptcy Code would serve none

4. Grant's "relation back" claim cannot succeed unless the trustee abandoned the chapter 7 estate's entire interest in all the Stobart prints. As a general rule, an abandonment does not relinquish an *undisclosed* interest in property. *See Dushane v. Beall*, 161 U.S. 513, 516, 16 S.Ct. 637, 638–39, 40 L.Ed. 791 (1896). Even though the jury could have found that Grant concealed eight or nine Stobart prints on November 20, 1987, *see infra* note 20, only two prints were found in the Grant residence prior to the putative abandonment. *See supra* note 2. The August 1989 settlement agreement merely provided:

> [T]he Trustee shall and does hereby abandon all claim, right, title and interest in and to the real property and *all property and furnishings located at 18 Everett Avenue, Winchester, Massachusetts.*

(Emphasis added). Given the site-specific description in the settlement agreement, we cannot rule out an intention to abandon only the interests of the chapter 7 estate in the *two* Stobart prints discovered at the Winchester residence designated in the agreement. Although the settlement agreement purportedly released Grant from all claims relating to the adversary proceedings pending against the Grants, including the action to deny Grant a discharge in bankruptcy based on alleged acts of fraudulent concealment, the settlement agreement merely provided:

> The trustee shall be deemed to have given a general release to John A. Grant and all other Debtors in these cases, *excepting* only any claims related to (1) undisclosed or heretofore unknown assets of the Jointly Administered Chapter 7 Estates, or (2) *assets wrongfully retained or withheld by John A. Grant and/or any other of the Debtors.*

(Emphasis added). In the complaint objecting to discharge, the trustee alleged that Grant had concealed "valuable Stobart prints," but did not specify their titles, number or value. Thus, the release contemplated by the settlement agreement reasonably can be interpreted to exclude prints still *being concealed* from the trustee at the time of the abandonment. Furthermore, as previously stated, the indictment charged a continuing concealment extending through the date of the indictment, and the district court instructed the jury on the continuing concealment theory.

5. Grant's motion for judgment of acquittal addressed neither the scope of the putative abandonment nor its legal consequences, *see supra* note 4, *see infra* notes 6 & 7, effectively depriving the district court of an opportunity to consider the merits of the "relation back" claim. Nevertheless, since the "relation back" claim urged on appeal would preclude the establishment of an essential element of the crime charged, we review for "plain error."

of the benign purposes for which it was fashioned. Rather, its extension to criminal proceedings for bankruptcy fraud arising out of a chapter 7 case would disserve the interests of justice which the "relation back" doctrine was designed to serve. *See, e.g., Wallace v. Lawrence Warehouse Co.,* 338 F.2d 392, 394 n. 1 (9th Cir.1964) ("[Relation back] is a fiction, and a fiction is but a convenient device, invented by courts to aid them in achieving a just result. It is not a categorical imperative, to be blindly followed to a result that is unjust."); *Rosenblum v. Dingfelder,* 111 F.2d 406, 409 (2d Cir.1940) ("Relation back may be considered in the nature of a fiction" which may be used if it "fits" the case at hand).

The bankruptcy doctrine of "relation back" was designed to assimilate the technical niceties of common law notions of title to the title vesting provisions of the Bankruptcy Act. *See generally* 4A James W. Moore, *Collier on Bankruptcy* ¶¶ 70.-05, 70.42, at 69–75, 499–516 (14th ed. 1978) [hereinafter "4A *Collier*"]. The technical rigidity of common law conceptions of title required that title at all times repose in some ascertainable person or entity. *Id.* at

73. Under the Bankruptcy Act, however, title to non-exempt property did not pass from the bankrupt by operation of law until the appointment and qualification of the trustee in bankruptcy, often weeks or months after the filing of the petition in bankruptcy. There being no alternative repository for the title of the bankrupt during the gap period preceding the qualification of the trustee in bankruptcy, the "vesting" mechanism of the doctrine of "relation back" became the fictional device whereby the trustee in bankruptcy acceded retroactively to the title held by the bankrupt as of the date of bankruptcy.[6]

The "relation back" mechanism principally at issue in the present case—the title "revesting" mechanism—was designed to afford retroactive relief from random inequities visited upon third parties during the pre-abandonment period occasioned by the unsynchronized interaction between the title vesting scheme ordained under Bankruptcy Act § 70 and the appointment and qualification of the trustee in bankruptcy under Bankruptcy Act §§ 44(a), 45, 50(b) & (k), 11 U.S.C. §§ 72(a), 73, 78(b) & (k).[7]

---

**6.** *The "vesting" mechanism.* The most familiar version of the "relation back" doctrine developed under the Bankruptcy Act was its title "vesting" mechanism. Under Bankruptcy Act § 70(a), 11 U.S.C. § 110(a), the title held by the bankrupt at the date of bankruptcy passed by operation of law to the trustee in bankruptcy *upon qualification, see* Bankruptcy Act §§ 44(a), 45, 50(b) & (k), 11 U.S.C. §§ 72(a), 73, 78(b) & (k), which might be weeks after the filing of a voluntary petition and many months after an involuntary petition. In the interim, the bankrupt frequently retained possession of the property, and not infrequently engaged in transactions relating to it. *See* 4A *Collier* ¶ 70.05, at 70. The "vesting" mechanism enabled the trustee in bankruptcy, upon qualification, to acquire the title held by the bankrupt at the date of bankruptcy, free of most interim transfers by the bankrupt, the principal exception being transfers from the bankrupt to bona fide purchasers for value in the ordinary course of business. *See* Bankruptcy Act § 70(d), 11 U.S.C. § 110(d); *see also* 4A *Collier* ¶ 70.05, at 70.

**7.** *The "revesting" mechanism.* Under the ancillary "revesting" mechanism, title to property abandoned by the trustee in bankruptcy as valueless or unduly burdensome, *see* 4A *Collier* ¶ 70.42, at 511, was deemed to revert to the bankrupt, or to a bona fide transferee from the bankrupt during the pre-abandonment period,

*see, e.g.,* Bankruptcy Act § 70(a)(2), (b) & (d), 11 U.S.C. § 110(a)(2), (b) & (d); *Brown v. O'Keefe,* 300 U.S. 598, 602, 57 S.Ct. 543, 546, 81 L.Ed. 827 (1937) (citing *American File Co. v. Garrett,* 110 U.S. 288, 295, 4 S.Ct. 90, 94, 28 L.Ed. 149 (1884)); *In re Yalden,* 109 F.Supp. 603, 604 (D.Mass.1953). In the rare instance where a post-abandonment title dispute arose between the bankrupt and an interim transferee, the trustee was deemed to have abandoned the title the bankrupt held at the date of bankruptcy, rather than the title held by the trustee in bankruptcy at the time of the abandonment. *See* 4A *Collier* ¶ 70.42, at 514. Under the title "revesting" mechanism, therefore, the bankrupt's pre-petition title to the abandoned property would be reinstated, free of any intervening act *by the trustee, see, e.g., Brookhaven Bank & Trust Co. v. Gwin,* 253 F.2d 17, 23, 23 n. 6 (5th Cir.1958) (although trustee's "strong-arm" powers arguably invalidated some pre-bankruptcy liens against bankrupt's property, thereby affecting the priority of competing lien claims to proceeds from trustee's sale of collateral, abandonment of proceeds revested title in debtor "as if it had never been in the trustee"), but subject to the rights of any interim transferee from the bankrupt, *see, e.g., Rosenblum v. Dingfelder,* 111 F.2d 406, 408–09 (2d Cir.1940) (bankrupt corporation could make valid pre-abandonment assignment to plaintiff of a chose in action even

During the pre-abandonment period, the bankrupt was able to effect transfers to third parties who could be required by the trustee in bankruptcy to disgorge the property which was the subject of the transfer. *See, e.g.*, Bankruptcy Act §§ 21(g), 70(d), 11 U.S.C. §§ 44(g), 110(d). In the event of an abandonment of the subject property by the trustee, the title "revesting" mechanism served to enable the interim transferee to assert the rights acquired by virtue of the interim transfer from the bankrupt.

The principal *raison d'être* of the "vesting" mechanism no longer obtains under the Bankruptcy Code. The commencement of a voluntary chapter 7 case establishes a chapter 7 estate to which virtually all property interests of the debtor pass by operation of law. *See* Bankruptcy Code §§ 301, 302, 541(a), 11 U.S.C. §§ 301, 302, 541(a). The chapter 7 estate becomes the immediate repository for whatever title the debtor held at the commencement of the case, precluding the gap period which arose in proceedings under the Bankruptcy Act. Given the demise of the gap period, and the fact that title no longer vests in the trustee, the continuing vitality of the ancillary "revesting" mechanism is questionable as well.[8] Thus, the technical hurdles obstructing Grant's attempt to deploy a coherent "relation back" theory are insurmountable.

Perhaps more importantly, however, neither "relation back" mechanism was designed to insulate bankruptcy fraud, either in the bankruptcy proceeding itself or in any related criminal proceeding. Like other criminal statutes, section 152 is intended to deter the outlawed conduct. *See, e.g., Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 423 (3d Cir.) (§ 152 intended to deter nondisclosure of assets),

*cert. denied*, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988); *see also Stuhley v. Hyatt*, 667 F.2d 807, 809 n. 3 (9th Cir.1982). Section 152 promotes efficient bankruptcy administration and an equitable allocation of the assets of debtor estates by criminalizing efforts to *preempt* a neutral and informed assessment by the trustee as to the status and value of the debtor's legal, equitable, and possessory interests in property at the commencement of the case. *See United States v. Cherek*, 734 F.2d 1248, 1254 (7th Cir.1984) ("It is a reasonable reading of 18 U.S.C. § 152 to conclude that the statute requires a bankrupt to disclose the existence of assets whose immediate status in bankruptcy is uncertain ... [e]ven if the asset is not ultimately determined to be property of the estate under the technical rules of the Federal Bankruptcy Code"), *cert. denied*, 471 U.S. 1014, 105 S.Ct. 2016, 85 L.Ed.2d 299 (1985). If the debtor's schedules omit or camouflage an asset, the chapter 7 trustee is disabled from exercising an informed judgment as to whether the debtor had a sufficient legal, equitable, or possessory interest to permit and warrant its liquidation for the benefit of creditors.

The present case exemplifies a type of harm the bankruptcy fraud statute was designed to prevent. Although Grant vigorously argues that all the Stobart prints were abandoned by the trustee, their settlement agreement is more naturally interpreted as an abandonment of the two Stobart prints located and inventoried at the Grant residence, and not the five or six other Stobart prints allegedly removed on November 20, 1987. *See supra* note 4. It is sufficient to note that Grant's concealment of Stobart prints on November 20, 1987, put the trustee at a significant disad-

---

though it then belonged to bankrupt estate). Thus, even though an interim transfer by the bankrupt might be voidable by the trustee in bankruptcy, *see, e.g.*, Bankruptcy Act § 70(e)(1), (2), 11 U.S.C. § 110(e)(1), (2), the "revesting" mechanism prevented the bankrupt from asserting a superior claim against the interim transferee.

**8.** Grant cites no case invoking the "relation back" doctrine under the Bankruptcy Code.

The "revesting" mechanism developed under the Bankruptcy Act was premised entirely on the *trustee's* prior accession to title, which now passes directly to the debtor estate under Bankruptcy Code § 541(a). The Code contains no provision which allows for an automatic, retroactive revesting of title in the debtor at the time of the abandonment. *See* Bankruptcy Code §§ 363(b), 554, 11 U.S.C. §§ 363(b), 554.

vantage in ascertaining the nature and value of the chapter 7 estate's interest in these prints. *See In re Tarpley,* 4 B.R. 145, 146 (Bankr.M.D.Tenn.1980) (abandonment revocable where trustee lacked knowledge or *"sufficient means of knowledge"*) (emphasis added).

The entire experience under the Bankruptcy Act reveals no recorded instance in which the doctrine of "relation back" was utilized to exonerate a bankrupt (or anyone else) from criminal responsibility for concealing property from a trustee in bankruptcy. The benign fiction that an abandonment reinstates the title the debtor held at the date of bankruptcy was designed to minimize injustice to third parties, not invite it. Similarly, as the doctrine of "relation back" lies in the realm of theoretics, its capacity to reform reality doubtless did not extend to undoing Grant's *removal and concealment* of the Stobart prints while they remained property of the chapter 7 estate, any more than an abandonment of property purposely ruined by fire could restore the premises, undo the arson, or exonerate the arsonist.

### b. *Sufficiency of Evidence of Ownership of Prints*

■ Grant challenges the sufficiency of the government's evidence that the Stobart prints were "property belonging to [his chapter 7] estate," within the meaning of 18 U.S.C. § 152, clause 1.[9] The present contention reduces to the basic proposition that particular elements of the prosecution's case, viewed in isolation, were incon-

clusive on the issue of the ownership of the Stobart prints.[10] Of course we review the evidence as a whole and in context, not in piecemeal isolation. *United States v. Geer,* 923 F.2d 892, 894 (1st Cir.1991) (per curiam); *United States v. Kaplan,* 832 F.2d 676, 679 (1st Cir.), *cert. denied,* 485 U.S. 907, 108 S.Ct. 1080, 99 L.Ed.2d 239 (1987). The determination whether a debtor held a legal, equitable, or possessory interest in property at the commencement of the case requires the fact-finder to evaluate all relevant direct and circumstantial evidence relating to the property and to the intent of the debtor. *See, e.g., Provencher v. Berman,* 699 F.2d 568, 572–73 (1st Cir. 1983) (fact-finder considers evidence relating to such criteria as the source of funds, donative intent); *accord In re Sommer,* 28 B.R. 95, 95–97 (Bankr.D.Colo.1983) (relevant factors may include the source of funds used to acquire the property, the record title, actual possession, intent of purchaser, payment of taxes, and maintenance of the property).

The government introduced evidence that (1) Grant signed most of the invoices as the "purchaser,"[11] (2) a Summit employee represented to its insurer that the Stobart prints were "owned" by Grant, (3) at least two prints were stored in the Grant residence, (4) Grant's chapter 11 schedules listed "15 prints & photographs ... located at 92 State Street" as his personal property,[12] and (5) during the chapter 7 proceedings, Grant testified under oath that the Stobart prints belonged to him.[13]

**9.** Even though the government might have charged Grant (under *either clause one or seven* of section 152) with concealing Stobart prints belonging to the *Summit* chapter 7 estates, the indictment specifically charged that "Grant owned framed prints" which he concealed from the trustee in *In re Grant,* Case 87–10831–CJK, Grant's individual chapter 7 case.

**10.** Grant argues, for example, that his listing of Summit's office address on some of the "Stobart print" invoices established an intent to donate them to Summit.

**11.** Grant argues that the government failed to produce cancelled checks issued to purchase the Stobart prints and that the checks remained in the possession of the trustee. Not only does the failure to produce the alleged checks not under-

mine the evidence presented by the government at trial, but Grant concedes that any such checks would have been as readily available to the defense by way of subpoena.

**12.** Grant points out that the attorney who prepared the chapter 11 petitions and property schedules was not called to testify to their accuracy. The government bore no burden to buttress the unchallenged reliability of the property schedules Grant signed under oath.

**13.** Grant's March 17, 1988 deposition was introduced at trial. At the deposition, Grant acknowledged that he had owned between eight and twelve Stobart prints, and expressly stated that he did not "believe [Summit] *ever owned* any of the prints." (Emphasis added.) Al-

Our review of a criminal defendant's challenge to an unfavorable jury verdict allegedly based on insufficient evidence is a deferential one:

> We assess the sufficiency of the evidence as a whole, including all reasonable inferences, in the light most favorable to the verdict, with a view to whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. We do not weigh witness credibility, but resolve all credibility issues in favor of the verdict. The evidence may be entirely circumstantial and need not exclude every reasonable hypothesis of innocence; that is, the factfinder may decide among reasonable interpretations of the evidence.

*United States v. Lopez,* 944 F.2d 33, 39 (1st Cir.1991) (quoting *United States v. Batista–Polanco,* 927 F.2d 14, 17 (1st Cir.1991)). Viewed in the light most favorable to the verdict, there was ample evidence that Grant acquired at least six Stobart prints in his own right, maintained them as his own, and well knew at the time of their removal that the prints belonged to his chapter 7 estate.

2. Evidence of Fraudulent Intent

■■ Grant insists that there was not enough evidence from which the jury could have concluded, beyond a reasonable doubt, that he removed the Stobart prints from his residence with the specific intent to defraud creditors. Analogizing to adversary proceedings under Bankruptcy Code § 727,[14] Grant contends that a debtor normally will not be denied a discharge based on allegations of fraudulent concealment if the property was *scheduled* or otherwise *disclosed* to the trustee during the early stages of the bankruptcy proceedings.

though Grant attempts on appeal to explain away the inconsistency, the effort falls short in light of his categorical denial that Summit ever owned any of the prints. The jury was responsible for evaluating any testimonial inconsistencies and was free to consider Grant's pre-indictment deposition as *substantive* evidence of his ownership of between eight and twelve Stobart prints. *See* Fed.R.Evid. 801(d)(1), (2).

**14.** Bankruptcy Code § 727(a)(2)(B) provides, in pertinent part:

*See, e.g., In re Hirengen,* 112 B.R. 382, 385 (Bankr.D.Mont.1989); *In re Wolmer,* 57 B.R. 128, 131–32 (Bankr.N.D.Ill.1986). The attempted analogy ultimately depends on the establishment of three theses: (1) Grant disclosed the Stobart prints in the schedules attached to the voluntary chapter 11 petition filed in March 1987; (2) Grant was never disabused of the good faith understanding that he was authorized, as the agent of the displaced chapter 11 debtor in possession, to use property of the chapter 7 estate and to remove the prints from the Grant residence; and (3) Grant arranged to return the prints immediately upon learning that their removal was not authorized. Our review reveals sufficient record evidence for finding, beyond a reasonable doubt, that Grant, with the requisite fraudulent intent, removed and continued to conceal the prints.

■ First, the manner of Grant's disclosure of the prints did not preclude a jury finding that he subsequently concealed them. The crime of concealment includes "withhold[ing of] knowledge" or "prevent[ing] disclosure *or recognition.*" *United States v. Turner,* 725 F.2d 1154, 1157 (8th Cir.1984) (§ 152 case) (emphasis added). Grant scheduled "15 prints & photographs ... located at 92 State Street" as his own property, neither providing a means of identifying any particular print, nor stating the total number or the individual or overall value of the prints. Since it was (and remains) impossible to determine from the property schedules how many Stobart prints were located at 92 State Street (or their identity and value), the schedules made no disclosure which would preclude the requisite fraudulent intent to conceal

(a) The court shall grant the debtor a discharge unless—

....

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed ...

....

(B) property of the estate, after the date of the filing of the petition....

the prints removed from the Winchester residence on November 20, 1987.[15]

Second, the evidence was sufficient to support a finding, beyond a reasonable doubt, that Grant knew that the chapter 7 conversion deprived him of any authority to remove property of the chapter 7 estate. The jury would have been entitled to conclude that a reasonable person in Grant's position, having been informed only a few hours earlier that the trustee suspected that items had been removed from Summit's offices, and having agreed to an immediate inventory of the contents of the Grant residence, would understand, either as a lay person or as an attorney, that he was not authorized to remove property from the residence prior to the inventory. In addition, Linda Young, who served successively as counsel to the chapter 11 creditors committee and the chapter 7 trustee, testified at trial that the legal consequences of the chapter 7 conversion were discussed with Grant and his attorney during their meeting at 92 State Street on the morning of November 20, 1987, just a few hours before Grant removed the Stobart prints from the Winchester residence. Among the matters discussed was the fact that the trustee was solely responsible for taking possession of "all of the assets of the various corporations *and Mr. Grant.*" (Emphasis added).

Third, the jury was not required to ascribe conclusive weight or import to Grant's testimony that he arranged to have the prints returned to the Winchester residence shortly after the trustee learned of their removal. Further, if the jury chose to credit Grant's testimony that he made arrangements to return the prints to the Grant residence, it was not required to conclude that the chapter 7 trustee was so

informed. Moreover, in neither event did Grant's testimony preclude a finding that he *removed* the prints with the requisite fraudulent intent to conceal, even if he returned them after their removal had been discovered. Although the replacement of removed property may be probative evidence of a lack of fraudulent intent, it is not dispositive. *See United States v. Klupt,* 475 F.2d 1015, 1018–1019 (2d Cir. 1973) (return of property not dispositive under § 152); *see also United States v. Rodriguez–Cardona,* 924 F.2d 1148, 1151 (1st Cir.) (proof of continuing criminal intent unnecessary; "it is sufficient to prove that a defendant had the necessary intent *at the time of the offense."*) (emphasis added), *cert. denied,* — U.S. —, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991). Given the highly incriminating circumstantial evidence, *see supra* at pp. 801–02, the jury was entitled to conclude that Grant possessed the requisite fraudulent intent to conceal the prints at the time he removed them from the Grant residence and thereafter.

### 3. Evidence of Value

Grant contends that section 152 implicitly requires that the concealment involve a "substantial amount" of property "material" to the chapter 7 estate, *see United States v. Key,* 859 F.2d 1257, 1261 (7th Cir.1988), which must be determined in relation to the overall value of the estate.[16] Relying on the "victim loss" calculation made at sentencing, *see* U.S.S.G. § 2F1.1, Grant argues that the government at best may have proven concealment of two Stobart prints worth $100, which must be considered too insubstantial a value, as a matter of law, in relation to a debtor estate of

---

**15.** Grant repeatedly testified at trial that he was uncertain as to the number of Stobart prints within his control on the eve of bankruptcy, even suggesting that many of the prints simply may have been left behind during Summit's various relocations prior to bankruptcy.

**16.** The district court declined to instruct the jury that the government was required to prove that the concealed property was "worth approximately $12,000," the amount charged in the

indictment. Instead, the jury was instructed that the government was required to prove, beyond a reasonable doubt, "that the prints represented a substantial amount of property, and that may be as little as several hundred dollars." *Cf.* Bankruptcy Code § 542(a), 11 *U.S.C.* § 542(a) (requiring turnover to trustee unless "property is of *inconsequential* value or benefit to the estate") (emphasis added).

$3,000,000 to $4,000,000.[17]

Grant cites no authority for the suggested "substantiality" requirement and nothing in the language of section 152 supports it. *See Kanner v. United States*, 21 F.2d 285, 287 (2d Cir.1927) (value of concealed property is not an essential element of the conduct criminalized under § 152); *cf. United States v. Solomonson*, 908 F.2d 358, 364–65 (8th Cir.1990) (unnecessary to prove actual financial loss to victim under bank fraud statute).[18] Furthermore, as the overriding prophylactic aim of the bankruptcy fraud statute is to deter and punish conduct which would inhibit the ability of the trustee, as distinguished from the debtor, *see* Bankruptcy Code § 542(a), 11 U.S.C. § 542(a); *see also supra* pp. 805–06, to *determine* whether property of the estate is of sufficient value to warrant liquidation and distribution for the benefit of creditors, we do not find the "substantiality" claim compelling in the present circumstances.[19]

■ Finally, a careful review of the record convinces us that there was sufficient evidence to support a jury finding, beyond a reasonable doubt, that Grant concealed as many as eight or nine Stobart prints.[20] Additionally, the jury was not

---

17. The "victim loss" estimate is not controlling in the present context, as it did not purport to reflect or approximate any finding of fact implicit in the general verdict, either as to the number of prints concealed or their value. *See infra* notes 20, 21 and accompanying text.

18. The authority cited by Grant is inapposite. *United States v. Key*, 859 F.2d at 1261, involved *false statements* by a debtor in the course of a bankruptcy proceeding, an offense punishable under clause 2 of section 152. *Id.* (false statement by debtor concerning allegedly worthless property is "material" if it either "bears a relationship to the bankrupt's business transactions or his estate, ... or pertains to the discovery of assets") (citing *United States v. Jackson*, 836 F.2d 324, 329 (7th Cir.1987)); *see also United States v. O'Donnell*, 539 F.2d 1233, 1237–38 (9th Cir.), *cert. denied*, 429 U.S. 960, 97 S.Ct. 386, 50 L.Ed.2d 328 (1976). It seems significant, nonetheless, that even in a prosecution for making a "material" false statement, the government need not prove that the statement resulted in actual harm to creditors. *See id.* at 1237.

Grant argues also that there was a fatal variance between the value alleged in the indictment ($12,000) and the value established at trial. Given our conclusion that the record would support a finding that the concealed prints were worth approximately $12,000, as alleged in the indictment, *see infra* note 21, Grant's variance claim cannot succeed. *See United States v. Flaherty*, 668 F.2d 566, 582 (1st Cir.1981) (substantial right implicated only where indictment too vague to allow defendant to prepare adequate defense, or exposes defendant to risk of double prosecution for same offense); *see also United States v. Beery*, 678 F.2d 856, 865 (10th Cir.1982) ("fact that the amount concealed [from receiver and trustee] was less than the amount contained in the indictment does not affect any substantial right.").

19. Although *de minimis* value may be probative evidence of the absence of an intent to defraud, *cf. In re Taub*, 98 F.2d 81, 82 (2d Cir.1938) ("[l]ack of value in the property omitted from the schedules tends to negative fraudulent intent") (objection to discharge under Bankruptcy Act); *In re Graham*, 122 B.R. 447, 448 (Bankr. M.D.Fla.1990) (same) (under Bankruptcy Code), the language of section 152, clause 1, does not require a showing that the concealed property was of substantial value. *Cf.* Bankruptcy Code § 542(a), 11 U.S.C. § 542(a) ("inconsequential value"). Moreover, the contention that the value of the concealed property must be determined in relation to the overall value of the debtor estate is more suitably tailored to fashioning a defense against prosecution for bankruptcy fraud than to fostering sound bankruptcy policy. There appears to be no appropriate correlation between the overall value of a debtor estate and the public policy favoring protection of creditors from fraudulent debtor conduct, except perhaps in the rare event where the value of the estate (large or small) exceeds all possible claims against it.

20. Grant argues that the testimony of Maureen Murphy, one of Grant's administrative assistants, was totally discredited on cross-examination. Murphy testified on direct examination that Grant had described to her the quality of the Stobart prints at the time he purchased them, and that approximately eight of the prints previously hung in the Summit offices where she worked. Murphy said she believed, based on her observations and familiarity with these Stobart prints, that Grant had removed eight or nine Stobart prints from his residence on November 20, 1987. On cross-examination, defense counsel repeatedly asked Murphy if she was "absolutely sure" about her identification, or whether it was "possible" that some of the framed objects were actually diplomas or photographs. Murphy conceded that she was not an art expert and that it was "possible" that some of the items were not actually Stobart prints. She nonetheless steadfastly maintained that she was "pretty sure" about her identification of the prints. Viewing all the testimony in context, and given the covert manner of Grant's removal

required to credit the liquidation-valuation evidence presented by Grant, rather than the much higher "cost" or "market value" evidence introduced by the government.[21]

## B. *Prosecutor's Closing Statement*

 Grant contends that the following statements by the prosecutor misstated the evidence and improperly impugned his credibility: Grant (1) testified that he "engaged in" the purchase of the Stobart prints, (2) was "excited about [the prints]" at the time of the purchases, (3) kept a list of the prints in his personal files, (4) knew that the prints would "go to his creditors" if he did not conceal them, (5) would have future access to the Winchester residence, thereby necessitating an immediate inventory of its contents, (6) misinformed the trustee at their November 20 meeting that he had an appointment with another attorney from 11:00 a.m. to 12:30, (7) could not have returned in time for the eleven o'clock meeting, according to the Boston–Winchester train schedule admitted in evidence, (8) filled his van with so many items from the Winchester residence that it was necessary to place additional items in his assistants' vehicles, (9) actually removed "eight or nine Stobart prints" from the residence, (10) told his assistants to return the prints because "we got caught," (11) never arranged to have his assistants return the prints to the residence, and (12) testified that "he didn't take those prints."

Since Grant did not object to any of the prosecutor's remarks at trial, we review for plain error, *see Rodriguez–Cardona,* 924 F.2d at 1154, evaluating the challenged remarks in the context of the entire record. *See United States v. Rosa,* 705 F.2d 1375, 1380 (1st Cir.1983). Our review reveals

that these statements were supported by the following evidence and the reasonable inferences drawn therefrom: (1) Grant did buy the Stobart prints, the only dispute being *in what capacity;* (2) Grant's assistant, Murphy, testified that Grant took the time to explain to her the special qualities of the remarqued prints shortly after Grant purchased them; (3) Murphy testified that Grant's personal files contained a list of Stobart prints identical to the list forwarded to Summit's insurer, *see supra* note 1; (4) Linda Young, Esquire, notified Grant that the chapter 7 trustee was proceeding to collect all assets of the estate for liquidation and distribution; (5) Grant's conduct demonstrated his right of access to the Winchester residence, and the trustee had agreed to allow Grant to continue to reside there; (6) Grant told the trustee at their November 20 meeting, which ended at 10:30 a.m., that he had an appointment with another attorney "later that morning" which would extend beyond noon; (7) Grant's statements to the trustee implied that he would not have time to return to Winchester, by train or otherwise, before his next meeting; (8) Grant would not have needed to ask his assistants to transport the prints if there had been additional room in his van; (9) Grant's assistant, Murphy, testified that she was "pretty sure" that at least eight of the framed items placed in the vehicles were Stobart prints; (10) Grant's other assistant, Dolores Donahue, testified that he told her that he "shouldn't have taken [the prints]"; (11) Grant did not arrange for the return of the prints until *after* the trustee had left the residence on November 20; and (12) Grant testified that he had removed only two prints from the

of the prints, the jury reasonably could have concluded that Grant concealed as many as eight or nine Stobart prints.

21. The two Stobart prints discovered at the Winchester residence were appraised by a general auctioneer who conceded at trial that he had appraised art work only three or four times in seventeen years, and that the low value he assigned the two Stobart prints was based on the assumption that they would be sold in a general auction along with all the other contents and

furnishings of the Grant residence. On the other hand, the government introduced evidence that the remarqued prints, part of a valuable limited series of art work, could have been sold separately through an art gallery at prices several times the auctioneer's valuation. Of course, Grant's concealment preempted any opportunity for the estate to determine the optimum mode of liquidation. Nevertheless, the lowest price listed by Stobart Gallery for any "remarqued" Stobart print as of November 1987 was $1,500; the highest $6,000.

Winchester residence, not the six prints charged in the indictment.

Grant contends that the prosecutor improperly injected his personal opinion into the case by stating that (1) it made "good sense" for the trustee to harbor suspicions about Grant and to decide to conduct an immediate inventory of the Winchester residence, and (2) that defendants often deny criminal intent and knowledge when they are caught in the act. The first set of statements, considered in context, did not express personal opinion, but attempted to characterize the trustee's actions on November 20, 1987, as objectively reasonable. The latter statements fairly informed the jury that Grant's disclaimers, after the event, as to his criminal intent and knowledge at the time of the event, were not dispositive. *See supra* p. 808.[22]

Based on a careful review of the record, we conclude that the prosecutor's statements, amounting at most to zealous characterizations of the government's evidence, were not improper, and neither affected the fundamental fairness of the trial nor resulted in a miscarriage of justice.

*Affirmed.*

---

22. Grant also contends that the prosecutor improperly vouched for (1) the testimony of Linda Young, by suggesting that she "ha[d] no interest in the [criminal] case" because her association with the Grant bankruptcy case had ended in 1988, and (2) the testimony of Grant's former assistants, by suggesting that, if they had any bias, it would be in *favor* of their former employer. Improper vouching occurs where " 'the prosecution ... place[s] the prestige of the government behind the witnesses [ ] by making explicit personal assurances of the witness' veracity,' " or where the prosecutor " 'implicitly vouch[es] for the witness' veracity by indicating that information not presented to the jury supports the testimony.' " *United States v. Martin,* 815 F.2d 818, 821–22 (1st Cir.1987) (quoting *United States v. Sims,* 719 F.2d 375, 377 (11th Cir.1983), *cert. denied,* 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984)). Gauged against these criteria, none of the prosecutor's remarks amounted to impermissible vouching.