**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jeraldine J. KEY, Defendant–Appellant.**

**No. 87–2765.**

United States Court of Appeals,
Seventh Circuit.

Argued April 14, 1988.

Decided Sept. 15, 1988.

Dennis L. Thomas, Jr., Bookwalter & Thomas, Indianapolis, Ind., for defendant-appellant.

Jeffrey L. Hunter, Asst. U.S. Atty., Bradley L. Williams, Acting U.S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before WOOD, Jr., COFFEY and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

The defendant-appellant, Jeraldine J. Key, appeals her conviction on charges of conspiracy to defraud the bankruptcy court and concealment of assets in violation of 18 U.S.C. § 152. Count 1 of a 10–count indictment returned against the defendant and her husband, Bobby Key, named Jeraldine Key as a coconspirator with her husband to defraud bankruptcy court proceedings. Count 2 alleged that Jeraldine Key and her husband concealed assets from creditors, and Counts 3 through 7 alleged that the defendants made "false oaths or accounts" in connection with the bankruptcy proceedings. We affirm the defendant's conviction.

I

The defendant-appellant Jeraldine Key and her husband have owned and operated a number of fast food restaurants and other retail businesses in the Southern District of Indiana and elsewhere for the past 15 years. In the third quarter of 1980, the defendant's husband and others organized three small corporations under Indiana law: Key & Koss, Inc.; D K & K, Inc. (later ABC Liquors, Inc.); and Kwik Mart Convenient Foods, Inc. The attorney who performed the legal services required to incorporate the three corporations, Seymour Bagal, testified that upon their formation, Bobby Key became the majority shareholder by purchasing 51 percent of each corporation, while other shareholders purchased the remaining 49 percent. At this time, Jeraldine Key did not own shares in any of the three aforementioned corporations. Barbara Koss, the corporations' Secretary, testified that she and Bobby Key, Jeral-

dine's husband, signed all of the stock certificates as corporate secretary and president, respectively. She also confirmed Bagal's testimony that Jeraldine Key held no ownership interest in the corporations, and that Bobby Key individually owned 51 percent of the stock in each of the three corporations. Further proof of ownership is reflected in the companies' income tax returns (from 1980 through 1982) for the three corporations, which listed Bobby Key as the owner of 51 percent of the shares in each of the three corporations.

Barbara Koss and Kathy Atkinson, an employee of the corporations, testified that during the summer of 1983 (three years after the formation of these three businesses), Bobby Key directed Koss and Atkinson to alter the records of the three corporations to make it appear that Jeraldine Key, rather than Bobby Key, had been the original purchaser of a majority of the stock in each of the three corporations. According to their testimony, Bobby Key also instructed the two aforementioned employees to obtain new stock certificates, as close to the originals as possible in appearance, and to inscribe thereon the information necessary to reflect Jeraldine Key as the owner of the majority of stock in the corporations *ab initio* (from the date of incorporation). Bobby Key told his two employees that the alterations and new certificates would vest ownership of the stock in his wife, and thereby avoid the attachment of his assets (including his majority interest in the corporations) resulting from a civil judgment against him.

At trial, both Koss and Atkinson testified that Jeraldine Key had participated actively in the typing of the substitute corporation record book entries. Jeraldine Key's signature and handwriting appear on many of the back-dated records. Seymour Bagal, the incorporating attorney, testified that he neither authored nor assisted in the preparation of the false records or documents.

Over a year following the alteration of these documents, the IRS imposed jeopardy assessments against the Keys for unpaid taxes on October 29, 1984, in the amount of $1,597,517.07. After the IRS filed the tax liens on the Keys' property, the Keys voluntarily filed petitions in the bankruptcy court pursuant to Chapter 11 of the Bankruptcy Code. Along with their bankruptcy petitions, the Keys filed schedules of liabilities and property. Jeraldine Key's schedule of assets listed her as 51 percent owner of the shares in Kwik Mart Convenient Foods, Inc. Her schedules failed to list her ownership of a majority of the stock in ABC Liquors, Inc., or Key & Koss, Inc., although her schedules did list debts which these two corporations owed her. Bobby Key's fraudulent schedules did not list his ownership of the stock in any of the aforementioned corporations.

During the bankruptcy proceedings Jeraldine Key testified under oath that as of the date of incorporation, she owned a majority of the stock in the three corporations and that Bobby Key did not own any of the stock in any of the three corporations. Subsequently, the government successfully sought an indictment charging the Keys with bankruptcy fraud under 18 U.S.C. § 152. The indictment against Jeraldine Key charged that Mrs. Key knowingly made materially false statements to the court (in both her written schedules and oral testimony) as to the true ownership of the stock in the three corporations.

Following a four-day jury trial, the jury returned verdicts of guilty on charges of conspiring to defraud the bankruptcy court, concealing of assets, and providing false oaths or accounts in connection with their bankruptcy proceeding. The defendant's appeal raises three issues: (1) the sufficiency of the evidence; (2) the propriety of instructing the jury on the definition of forgery under Indiana law; and (3) the prejudicial effect of two jurors obtaining knowledge from outside sources that the defendant's husband had previously been convicted for tax evasion.

## II

In support of her claim that the government failed to prove its case beyond a reasonable doubt, the defendant submits a disjointed series of arguments, most of which have no bearing on the elements of

the crime charged in the indictment. Before analyzing these arguments (briefly), we set forth the elements of criminal bankruptcy fraud under 18 U.S.C. § 152. That section provides in relevant part that:

> "Whoever knowingly and fraudulently makes a false oath or account in or in relation to any bankruptcy proceedings; or
>
> Whoever knowingly and fraudulently presents any false claim for proof against the estate of a bankrupt, or ...
>
> Whoever, after the filing of a bankruptcy proceeding or in contemplation thereof, knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false entry in any document affecting or relating to the property or affairs of a bankrupt; ...
>
> Shall be fined not more than $5,000 or imprisoned not more than 5 years, or both."

Curiously, most of the defendant's arguments are not even tangentially related to these elements. For instance, the defendant maintains that the government failed to prove: (1) that it was a "major creditor" of the Keys; or (2) that the defendant "received any income from any of the alleged activities of her husband." Moreover, the defendant contends that an improperly imposed IRS jeopardy tax assessment against her caused the Keys to file for bankruptcy relief. But even if true, these contentions would lead the defendant nowhere, for a violation of § 152 does not depend upon proof of any of these three "elements." To the contrary, the essence of the offense under § 152 is the making of a materially false statement or oath with the intent to defraud the bankruptcy court, *see United States v. Phillips*, 606 F.2d 884, 886 (9th Cir.1979); it is thus not a defense to allege that an injustice led to the bankruptcy filing (for which other avenues of relief are available), or that the defendant did not realize the fruits of her fraudulent acts. Section 152 prohibits false statements and

concealment of assets; no more and no less.

■ Judged in these terms, the evidence is most sufficient to uphold the jury's verdict. Our standard of review is "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Shriver*, 842 F.2d 968, 975 (7th Cir.1988) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)). In this case, at least two witnesses (Koss and Atkinson) affirmatively testified that the defendant had participated actively in the preparation of substitute corporate records, a fraudulent alteration which made it appear that she owned a 51 percent share of the three corporations as of the date of their incorporation. Later, during bankruptcy proceedings, the defendant filed and signed schedules listing her as the owner of 51 shares of Kwik Mart Convenient Foods, Inc. Further, during a hearing on a motion for appointment of a trustee, the defendant testified under oath that she has been the majority shareholder in each of the three corporations from the date of their incorporation. A combination of the direct eyewitness testimony of Koss and Atkinson and the documentary evidence introduced at trial provides overwhelming support for the jury's finding that the defendant's statements (given under oath) regarding her stock ownership were made with actual knowledge of their falsity and with the intent to defraud and to deceive the bankruptcy court.

Having thus disposed of the arguments that make up the lion's share of the defendant's brief, we turn to the defendant's best argument. She maintains, *inter alia*, that the three corporations at issue were essentially worthless at the time of their deceptive transfer to her;[1] hence, that any mis-

---

1. Whether the three corporations were in fact "worthless" at this time is not entirely clear. For instance, although the defendant points out that D K & K, Inc. (later renamed ABC Liquors) sustained a $57,000 loss during fiscal year 1983,

the government at oral argument noted that the subsequent sale of ABC Liquors netted some $65,000. Further, the testimony of Special Agent Heckard reports relatively small gains

statements as to their true ownership are immaterial. Although § 152 does not expressly include "materiality" as an element of the offense, we have construed this section " 'to require that [a] false oath be given in relation to some material matter.' " *United States v. Jackson*, 836 F.2d 324, 329 (7th Cir.1987) (quoting *United States v. O'Donnell*, 539 F.2d 1233, 1237 (9th Cir.), *cert. denied*, 429 U.S. 960, 97 S.Ct. 386, 50 L.Ed.2d 328 (1976)). *See also Lee Supply Corp. v. Agnew*, 818 F.2d 1284, 1290 (7th Cir.1987) (construing false oath under 11 U.S.C. § 727(a)(4)(A)—denial of discharge—as requiring relation of oath to a material matter). "Proof of materiality requires that an oath or concealment either bears a relationship to the bankrupt's business transactions or his estate, ... or pertains to the discovery of assets, including the history of a bankrupt's financial transactions." *Jackson*, 836 F.2d at 329 (citations omitted). *See also United States v. Phillips*, 606 F.2d 884, 886–87 (9th Cir. 1979).

■ With respect to the materiality question, the judge (over the defendant's objection) instructed the jury as follows:

"The materiality of a matter, as to which an alleged false oath or statement was made, is not a matter with which you need be concerned, but rather is a question for the court to decide. You are instructed that any oath made as to what assets or property belonged or did not belong to a person who files a Chapter 11 proceeding in bankruptcy is material to such proceeding. Likewise, an oath made as to what assets or property belonged or did not belong to a person seeking a bond reduction is material to such proceeding."

This may be an overly broad statement of the legal standard for materiality.[2] Nevertheless, we do note that the determination of the materiality of a false statement is a question of law, *cf. United States v. Shriver*, 842 F.2d 968, 977 (7th Cir.1988) (the question of materiality under 18 U.S.C. § 1014—dealing with false statements to a federally insured bank—is one of law to be resolved by the judge, not the jury), and as explained below, we agree with the trial court's implicit finding that the defendant's statements regarding the ownership of the corporations were material as a matter of law. Thus, because the judge's materiality instruction was correct in the context of the statements actually made in this case, the breadth of the judge's statements to the jury fail to rise to the level of reversible error.

■ Even assuming *arguendo* the accuracy of the defendant's representation that the corporations were essentially worthless, "materiality does not require a showing that creditors are harmed by the false statements.... Materiality is ... established when it is shown that the inquiry bears a relationship to the bankrupt's business transactions or his estate, or concerns the discovery of assets, including the history of a bankrupt's financial transactions." *O'Donnell*, 539 F.2d at 1237. *Cf. United States v. Braverman*, 522 F.2d 218, 223 (7th Cir.), *cert. denied*, 423 U.S. 985, 96 S.Ct. 392, 46 L.Ed.2d 302 (1975) ("[t]he fact that [a bank officer] granted the loan before the [false] statement was submitted is irrelevant since, as the defendant concedes, materiality does not depend upon actual reliance"). Under these standards we agree with the government (and the district court) that the character of Jeraldine's false statements fulfilled the materiality requirement of 18 U.S.C. § 152. The statements clearly concern the bankrupt's business transactions and the history of her financial transactions. As the government

and losses for Key & Koss, Inc. between 1980–82 (in the $8,000 per year range).

2. In this vein, Judge Easterbrook asked counsel for the government at oral argument whether an intentional misstatement as to the owner of a ream of paper in a multi-million dollar bankruptcy proceeding would constitute a felony under § 152. Counsel appeared to concede that such a misstatement would not, as it would flunk the materiality requirement of § 152. If this concession is accurate, then the court's instruction that "any oath made as to what assets or property belonged or did not belong to a person who files a Chapter 11 proceeding in bankruptcy is material ..." may conceivably be argued as being overbroad.

properly pointed out at oral argument, the truthful disclosure of such transactions are important in enabling the trustee to trace the debtor's assets and/or to determine whether assets have been fraudulently transferred. We thus conclude that under *Jackson,* the trial judge properly instructed the jury that the defendant's misstatements as to the ownership of the three corporations were material as a matter of law.

## III

■ The defendant further maintains that the trial judge erred in reading this forgery instruction (based upon Indiana law) to the jury:

"A statute of the State of Indiana provides as follows:

A person who, with intent to defraud, makes or utters a written instrument in such a manner that it purports to have been made:

   (1) by another person;

   (2) at another time;

   (3) with different provisions; or

   (4) by authority of one who did not give authority;

   (5) commits forgery; ...

If you find beyond a reasonable doubt that stock certificates were issued or reissued in violation of the statute, you may find that the same were of no legal effect."

The defendant insists that the injection of the forgery issue into a case not involving forgery as an element of the crime not only confused the jury but also prejudiced the defendant. According to the defendant, an officer and majority shareholder of a corporation may legally transfer shares of his or her stock *nunc pro tunc* (in this case back dating corporate records to make it appear as if Jeraldine Key had owned the stock from day one) without committing forgery; thus, if the officer subsequently conceals or fabricates facts about the transfer, he may be guilty of fraud, but not forgery. Accordingly, the defendant maintains, the forgery instruction only served to confuse the jury and cause it to proceed to verdict on an improper basis.

This argument conveniently ignores a crucial element of the forgery instruction—the intent to defraud. Contrary to the defendant's assertions, a corporate officer *may* be found guilty of forgery under Indiana law if *"with intent to defraud,* [the officer] makes or utters a written instrument in such a manner that it purports to have been made ... (2) at another time." (Instruction No. 25) (emphasis added). *See* I.C. 35–43–5–2. The inference that Bobby Key intended to defraud a judgment creditor by means of the back-dated records and substitute stock certificates is supported in the record. Thus, the sole question that remains in analyzing the propriety of the forgery instruction is whether the completed Indiana law crime of forgery is somehow material to the federal crimes of bankruptcy fraud charged in the indictment.

The government explains that the existence of a forgery related to the falsity of Jeraldine Key's testimony that she had owned the stock since the day of its original issuance in 1980. The government's theory at trial was that the defendants carried out their scheme to confer legal ownership of the stock *nunc pro tunc* by means of substitute stock certificates and back-dated records with the intent to defraud, so that the attempted secret and deceptive transfer failed to confer legal ownership of the stock to Mrs. Key (as of 1980 or otherwise). Hence, the forged documents demonstrate the falsity of the defendant's representation that she was the legal owner of the stock.

While the forgery instruction does not, strictly speaking, address an element of the offense under § 152, we agree with the trial court that forgery was a material subsidiary issue with respect to the government's theory as to the existence of one of § 152's key elements—the falsity of the defendant's statements. In *United States v. Machi,* 811 F.2d 991, 995 (7th Cir.1987) we stated that: "[i]t is axiomatic that in determining the propriety of instructions, they are to be viewed as a whole.... As long as the instructions treat the issues fairly and adequately, they will not be interfered with on appeal." (Quoting *United States v. Patrick,* 542 F.2d 381, 389 (7th

Cir.1976)). "Thus, we refuse to read [the] challenged jury instruction in isolation, but rather we review all of the trial court's jury instructions and determine whether after reading the instructions in their entirety, they fairly and adequately inform the jury of the proper law to be applied to the facts of the case." *Machi,* 811 F.2d at 995. Reviewing the jury instructions in their totality and the forgery instruction in context of the remaining elements' instructions, we are convinced that the jury instructions fairly and adequately set forth the law supporting the parties' respective theories of prosecution and defense. We are further persuaded that the forgery instruction did not confuse the jury or unfairly prejudice defendant. The instruction neither purported to represent that forgery (standing alone) was an element of the offense nor did it imply that the jury should convict on that basis. In fact, the instruction explained that the only inference to be drawn from a finding of forgery is "that the [attempted reissuance of the stock certificates] were of no legal affect." As such, the court did not err in instructing the jury on the definition and legal effect of forgery under Indiana law.

### IV

█ The final issue on appeal concerns information not introduced into evidence, but which, through no misconduct on the part of the prosecution, made its way into the possession of two jurors from outside sources. At an evidentiary hearing on the defendant's motion for a new trial, two jurors testified that they had learned that Bobby Key had been convicted for tax evasion. During the hearing, juror Lawson testified that after the second or third day of trial, her boyfriend had informed her of Bobby Key's conviction (the record fails to reflect how Lawson's boyfriend came into possession of the information). Although the judge had admonished the jurors not to discuss the case among themselves before deliberating, the next day Lawson told ju-

ror Hall what she had learned, adding that she did not know whether the information was true. Hall testified that after their conversation, she "didn't really think anything else about it." The information was apparently confined to these two jurors.[3] At the conclusion of the hearing, the court, citing *United States v. Bruscino,* 687 F.2d 938, 940 (7th Cir.1982) (*en banc*), found that there was no reasonable possibility this "random conversation" could have affected the jury's verdict, particularly in view of the overwhelming evidence against the defendant.

█ On this appeal, the defendant initially argues that the jurors' knowledge of Bobby Key's prior tax evasion conviction is so inherently prejudicial as to warrant reversal *per se,* i.e. without a showing that there is a "reasonable possibility" that the extraneous material affected the jury's verdict. Our *en banc* decision in *Bruscino, supra,* lays this argument to rest.

In *Bruscino,* we explained that "[a] criminal defendant in our system has a right to be tried on the basis of evidence admitted in trial, and this right may be violated if the jury gets access to extra-record evidence ... even if that access is not the result of any prosecutorial misconduct." 687 F.2d at 940. But contrary to the defendant's contention, a new trial is not automatically required whenever a jury is exposed to information not properly in evidence for, as *Bruscino* notes, "there has to be some showing of prejudice." *Id.* Thus, our cases hold that "a new trial is required only when there is a 'reasonable possibility' that the material affected the jury verdict." *United States v. Weisman,* 736 F.2d 421, 424 (7th Cir.1984). "Each case 'must turn on its special facts,' ... and in each case the crucial factor is 'the degree and pervasiveness of the prejudicial influence possibly resulting' from the jury's exposure to the extraneous material." *Id.* (citations omitted).

The trial judge's analysis of the issue during the evidentiary hearing on the de-

---

**3.** A third juror testified that she brought a newspaper into the jury room on the third day of trial "out of habit," and while reading the paper noticed an article about the trial. The judge had previously admonished the jury not to read newspaper accounts of the case, and this juror testified that she did not read the article, nor is there evidence that any other juror read any article about the trial in the media.

fendant's motion for a new trial convinces us that the judge properly applied these standards in finding that there was no reasonable possibility that the random conversation between jurors Hall and Lawson affected the jury's verdict. As *Bruscino* makes clear, we review the judge's determination of prejudice (or lack thereof) for an "abuse of discretion" only, for "the inquiry into prejudice becomes a matter of addressing the probabilities that a particular jury was prejudiced by particular documents. [Thus], [t]he trial judge will always be in a better position than the appellate judges to assess the probable reactions of jurors in a case over which he has presided." As *Bruscino* states:

> "He [the trial judge] has had the opportunity to observe the jurors' demeanor and gauge the attentiveness, as the appellate judges have not. He can also judge, as we cannot, whether the atmosphere of the trial—that congeries of intangibles that no stenographic transcript can convey—might have made the jury receptive to being prejudiced by the documents in question, or for that matter, might have inoculated it against such prejudice. As we cannot put ourselves in the district judge's shoes in these matters we ought to accept his judgment unless we have a very strong conviction of error."

687 F.2d at 941. *See also United States v. Mazzone*, 782 F.2d 757, 763–64 (7th Cir. 1986). Admittedly, *Bruscino* dealt with the situation in which the judge was prohibited from questioning the jurors because they had already given their verdict. 687 F.2d at 941. Still, the reasons for according great deference to the judge's determination of prejudice (i.e. the ability to observe the jurors' demeanor) apply with equal (if not greater) force to a case where the judge has in fact questioned the jurors. Thus, we apply *Bruscino*'s abuse of discretion standard in analyzing the propriety of the judge's finding of a lack of jury prejudice.

In this case, the district judge conducted a full evidentiary hearing which dealt in detail with the issue of juror prejudice, and reasonably found that several factors militated against the possibility that the extraneous information had affected the jury's verdict. First and foremost, the court properly determined that the overwhelming nature of the evidence against Jeraldine Key essentially had negated the possibility that the jury would have reached a contrary verdict. Our independent review of the trial transcript confirms this finding. In addition, the government properly points out that the extra-record evidence did not concern the defendant herself, but rather her husband (defense counsel's assumption—expressed during oral argument—that the jury would necessarily view the acts of husband as her own strikes us as somewhat outdated). Juror Hall testified "that she really didn't think anything about it [the extra-record information]," [4] and Hall and Lawson testified that they did not discuss the information with other jurors.[5] This is therefore not a case in which one or more jurors used extraneous material in an attempt to influence the votes of others. *See United States v. Thomas*, 463 F.2d 1061, 1063 (7th Cir.1972). Further, we note that the trial judge took appropriate steps

---

4. The defendant also claimed at oral argument that the trial judge committed reversible error in not allowing defense counsel to inquire fully into the jury's deliberative process at the evidentiary hearing. Our reading of the hearing transcript, however, reveals that the judge did not prevent counsel from asking proper questions about the deliberative process, such as whether the jurors could decide the case based solely on the evidence properly admitted at trial; rather, the judge merely sustained the government's objections to questions asking the jurors for hearsay declarations about what *other jurors* had told them. The judge allowed a full and complete inquiry into the facts relevant to the issue of jury prejudice.

5. Juror Lawson testified as follows:
   "Q Ms. Lawson, is it or is it not true you conveyed to a juror known as Lynn Hall during those proceedings that in fact you had come to know that the Mr. Key, Bobby J. Key, had been previously convicted of income tax evasion and had been in jail for that offense?
   A Yes, I found out on the Thursday.
   Q Thursday?
   A Yes.
   Q If my memory is correct, that would be on or about the 6th day of August, 1987?
   A Probably.
   Q Where did that information come from?
   A From my boyfriend.
   .     .     .     .     .

to ensure the integrity of the trial, including giving proper admonitions about trial publicity and instructing the jury not to discuss the case among themselves before deliberating. While one of the jurors disregarded the judge's admonitions, the judge held a thorough evidentiary hearing on the issue of jury prejudice, and properly found that the extra-record information—confined to two of the twelve jurors—did not impact on the verdict itself. *See Weisman*, 736 F.2d at 426. Our independent examination of the record confirms this finding. Finally, immediately upon discovering the possibility of juror misconduct, the judge conducted an inquiry into the prejudicial effect of the extraneous information as required in this circuit. *Id.* Under these circumstances, we are left short of having "a very strong conviction" that the judge abused his discretion in finding that the isolated conversation between jurors Hall and Lawson failed to create a reasonable possibility that the extraneous material affected the jury's verdict.

Accordingly, the defendant's conviction is

AFFIRMED.

Q With whom else did you discuss this prior conviction of Mr. Key?
A Lynn Hall.

Q Any other juror?
A No."