**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Thomas STANIFORTH, Defendant–
Appellant.**

No. 91–3325.

United States Court of Appeals,
Seventh Circuit.

Argued April 10, 1992.

Decided Aug. 12, 1992.

Rehearing Denied Sept. 22,
and Oct. 29, 1992.

Daniel P. Bach, Asst. U.S. Atty., Larry Wszalek (argued), Office of U.S. Atty., Madison, Wis., for plaintiff-appellee.

Michael S. Heffernan, Stolper, Koritzinsky, Brewster & Neider, Steven C. Underwood (argued), Madison, Wis., for defendant-appellant.

Before POSNER and MANION, Circuit Judges, and BURNS, Senior District Judge.[*]

POSNER, Circuit Judge.

At the end of a four-day trial, a jury convicted Dr. Thomas Staniforth, a dentist in the town of Wisconsin Rapids, of three counts of making false statements for the purpose of influencing a federally insured bank, the Community State Bank of Wisconsin Rapids, in violation of 18 U.S.C. § 1014. The judge gave him concurrent prison sentences of eight months.

Staniforth was a long-term customer of the bank and a personal friend of its chief executive officer, Norbert Brunner. As is common with small banks, the bank's procedures were often informal. In July 1986 Staniforth had a loan outstanding from the bank of $36,000 (we round all dollar figures to the nearest thousand). Brunner called him one day to tell him it was time to renew the loan and the bank would therefore need a new financial statement. Staniforth came over to the bank on his lunch hour. The two met for about a quarter of an hour. Brunner asked Staniforth questions and used the answers to complete a form entitled "Individual Financial Statement," which Staniforth then signed. Brunner asked Staniforth whether he owned any stock and when Staniforth answered that he owned 50,700 shares of common stock of Possis Corporation (a manufacturer of medical devices) Brunner looked up the stock in the *Wall Street Journal*, computed the total market value of Staniforth's shares, and wrote down the figure ($1,216,000) in the assets column on the financial statement. This turned out to be roughly 90 percent of the total assets listed in the statement. When asked about liabilities Staniforth mentioned only the $36,000 note payable to the bank—the note he was renewing. As a result, his net

* Hon. James M. Burns of the District of Oregon, sitting by designation.

worth as listed in the statement exceeded $1.3 million. The loan was renewed.

Staniforth had neglected to tell Brunner that the stock had been purchased on margin and that he owed his broker approximately $550,000; and Count I of the indictment alleges that Staniforth knowingly failed to disclose his full liabilities in order to influence the bank to renew the loan. His defense was that he had not thought he had to disclose the debt to the broker, because Brunner did not ask him whether he had purchased the stock on margin. This is weak but it may have disturbed the prosecution sufficiently to make it shift ground and argue to the jury that Staniforth had exaggerated the value of his stock interest by failing to disclose that he was not the full owner of the stock but merely the owner of the equity interest in it, that is, the difference between the market value and the debt to the broker. If the jury believed this it would not have to worry about Staniforth's failure to disclose the debt; the false statement would have been his answer to Brunner's question whether he owned any stock that he owned all 50,700 shares, when in fact he owned just his equity in them.

■ If this is what the government did, then Staniforth is correct that it amended the indictment and the conviction must be reversed. In the federal system, if you are indicted for X, you cannot be convicted of Y (unless it is a lesser included offense of X) because that would deny you your right not to be charged with a federal crime other than by a grand jury. *Stirone v. United States*, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960); *Schmuck v. United States*, 489 U.S. 705, 719, 109 S.Ct. 1443, 1452, 103 L.Ed.2d 734 (1989); *United States v. McAnderson*, 914 F.2d 934, 944–45 (7th Cir.1990); *United States v. Adams*, 778 F.2d 1117, 1122–25 (5th Cir.1985). Staniforth would also be correct that no reasonable jury could have found him guilty of falsely representing the value of his shares of Possis stock. They were worth the market value times the number of shares that he owned. If you own a house worth $250,000 and have a mortgage on it with an unpaid balance of $175,000, you are the "full" owner of an asset worth $250,000, and you should list $250,000 under assets and $175,000 under liabilities—not, as the government unguardedly suggested at the argument of this appeal, $75,000 under assets. That would be nonsense, as shown by the fact that the financial-statement form that Staniforth signed lists "real estate mortgages" in the liabilities column. If in our hypothetical case the homeowner were required to list the value of his house as $75,000 and his real estate mortgage as $175,000, his net worth (assuming no other assets or liabilities) would be −$100,000, rather than +$75,000.

■ We are distressed by the government's equivocations and confusions over this elementary accounting convention. But we do not think it infected the trial of Count I with fatal error. At trial the government, while mistakenly urging that Staniforth did not own all the stock, did not argue that therefore he had made a false entry in the asset column of his financial statement. Instead the government argued, correctly, that by failing to disclose that he had purchased the stock on margin and owed the brokerage firm a considerable sum, Staniforth had overstated his net worth. It was in this connection that the government brought out the difference between ownership and equity.

■ Staniforth argues that his failure to disclose his total liabilities was immaterial because even if his net worth was only half of what he represented it to be, it greatly exceeded the modest loan that he was seeking to renew. The word "material" does not appear in section 1014 and, as an original matter, one might have supposed that the omission was deliberate. Section 1014 is a criminal statute and many criminal statutes place greater emphasis on the character of the defendant's act (including the intent behind it) than on the consequences. On the assumption that the omission of the "material" from the statute was deliberate, all that would be required of the government was proof that the defendant intended to influence the bank, although the materiality of his statement would

come in by the back door because, the less material the statement was, the less likely it was to have been made for the purpose of influencing the bank, rather than out of sheer forgetfulness, carelessness, or confusion. If an assistant U.S. attorney doesn't know what an asset is, why should a dentist be expected to know what a liability is?

█ The courts nevertheless have held that materiality, defined as being *capable* of influencing the bank, is an element of the offense under section 1014. *United States v. Shriver*, 842 F.2d 968, 976–77 (7th Cir.1988); *United States v. Henderson*, 645 F.2d 569, 575 (7th Cir.1981); *United States v. Braverman*, 522 F.2d 218, 223 (7th Cir.1975); *United States v. Key*, 859 F.2d 1257, 1261 (7th Cir.1988) (dictum); *United States v. Haddock*, 956 F.2d 1534, 1550–51 (10th Cir.1992); *United States v. Ribaste*, 905 F.2d 1140, 1143 (8th Cir.1990). It is true that our decision in *United States v. Hoag*, 823 F.2d 1123, 1125–26 (7th Cir. 1987), which interprets a similar false-statement statute, 18 U.S.C. § 1010, as not requiring proof of materiality, has created, as we noted in *United States v. Shriver, supra*, 842 F.2d at 977 n. 12, an unresolved tension with the decisions cited above. *Hoag* neither cites any of them nor refers to section 1014. But despite *Hoag*, and despite the argument in the preceding paragraph, we think the better view is that materiality is an element. Otherwise the statute would punish harmless attempts— that is, the making of a false statement *incapable* of influencing a bank—and this would greatly expand the potential reach of the statute, with few benefits that we can see.

█ The cases also hold that materiality is a question of law, and hence to be decided by the judge. E.g., *United States v. Shriver, supra*, 842 F.2d at 977; *United States v. Haddock, supra*, 956 F.2d at 1550. This is more than a little puzzling. A criminal defendant is entitled to require the prosecutor to prove to the jury's satisfaction every element of the offense, *Estelle v. McGuire*, —— U.S. ——, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991); *Bates v. McCaughtry*, 934 F.2d 99, 102 (7th Cir.

1991), and materiality, we have just seen, is one of the elements in a prosecution under section 1014. The proposition that it is a question for the judge traces back to cases involving prosecutions for perjury, e.g., *Sinclair v. United States*, 279 U.S. 263, 298, 49 S.Ct. 268, 273, 73 L.Ed. 692 (1929), where materiality refers to the legal *relevance* of the question to the trial or investigation in which the defendant answered the question falsely, while here it refers to the factual issue of whether the false statement could have influenced the bank in making a loan. The Supreme Court applied the perjury rule to a false-statement statute (18 U.S.C. § 1001) in *Kungys v. United States*, 485 U.S. 759, 772, 108 S.Ct. 1537, 1547, 99 L.Ed.2d 839 (1988), on the authority of *Sinclair*, without remarking the difference between that context and the one in which the rule had been developed. See also *Weinstock v. United States*, 231 F.2d 699, 702–03 (D.C.Cir.1956). But *Kungys* involved a false statement to a government agency (the Immigration and Naturalization Service), and the tendency of a statement to mislead the government depends on its relevance to the criteria applied by the agency. So the Court went on to examine whether the misrepresentation concerned a fact relevant, under the governing statute, to the agency's consideration of the defendant's petition for naturalization. 485 U.S. at 773–74, 108 S.Ct. at 1548. Relevance is a legal determination. Juries are told what is relevant; they do not make determinations of relevance. But the question whether a false statement to a bank or other business firm is capable of influencing the firm's decisions is no more a question of law than whether a false statement to a prospective investor is capable of influencing his decision to invest and therefore is material to that decision. The distinction was overlooked in *United States v. Daily*, 921 F.2d 994, 1004 (10th Cir.1990), where the Tenth Circuit, which had distinguished cases based on *Sinclair* in *United States v. Irwin*, 654 F.2d 671, 677 n. 8 (10th Cir. 1981), held that *Kungys* constrained it to hold that materiality is a question of law in prosecutions under the federal false-statement statutes.

We need not attempt to resolve today the interesting issue of whether materiality in a prosecution under section 1014 is a question of fact or a question of law. We do not understand Staniforth to be questioning that it was the latter.

■ In closing argument the prosecutor told the jury that the defense's contention that Staniforth had had no motive to misrepresent his liabilities because his true net worth so greatly exceeded the amount of the loan that he was seeking to renew "misses the point": "the argument that he makes is really or really goes to the materiality of that statement" and "Judge Crabb will instruct you that the statement was material." In other words materiality was not a jury issue, which, whether true or not, Staniforth concedes, so the intent with which he made the false statement was irrelevant, which was false and is not conceded. Staniforth could be convicted only if his purpose in omitting a liability was to influence the bank in renewing the loan. The higher his true net worth, the less likely it is that the omission was powered by such a design.

Yet the emphasis that he wanted to place on net worth may have been a way of throwing sand in the jurors' eyes. Margin is a particularly risky form of borrowing to the borrower, and hence to subsequent lenders to the borrower. If you borrow money secured by your house and use the money to buy stock which later declines in value, the lender has the security of the house and in the unlikely event that he was looking to your dividend income to make the mortgage payments that income may not be impaired in the slightest by the fall in the market value of the stock. The situation is different with a margin account. The broker's loan is secured by the stock itself and the borrower is required to maintain a prescribed equity cushion no matter how much the market value of the stock falls. It's as if a mortgagee could demand repayment of a part of the loan every time the market value of the mortgaged property declined. Suppose, to take a simplified version of Dr. Staniforth's case, that he had borrowed $455,000 to help him buy $650,000 worth of stock. (The broker testified that he required Staniforth to maintain a margin of 30 to 35 percent; our simplified example, in which the broker is assumed to require him to maintain a $195,000 spread between the value of the stock and the amount owed to the broker, assumes a margin requirement of 30 percent.) If the value of the stock fell by 10 percent, to $585,000, the broker, who retains custody of stock purchased on margin for just this eventuality, would be entitled to sell so much of the stock as necessary to preserve the 30 percent margin. The broker would therefore sell $152,000 worth of the stock, since after this was done Staniforth would have in his account stock worth $433,000 and would owe the broker $303,000. That would mean, however, that while the value of the stock had fallen by only 10 percent, the value of Staniforth's equity had fallen by 33 percent. If the value of the stock fell by 30 percent, Staniforth would be wiped out completely. The broker would be protected, but Staniforth's ability to repay any other debts he had, including his debt to the bank, would be severely impaired.

This analysis shows that a rational jury could have found that Staniforth did intend to influence the bank when he omitted mention of the huge debt to his broker. The question, however, is whether the prosecutor's comment that we quoted above, or anything else in the conduct of the trial, prevented Staniforth from putting his explanation of his intent before the jury in an intelligible way. The comment in itself did not, but in addition the judge sustained an objection to Staniforth's question to Brunner, would the bank have renewed the loan if it had known the true facts? We do not understand the basis for the judge's ruling. It prevented Staniforth from presenting his defense, and while the defense was thin we cannot conclude that it was so unsupported that the judge was entitled to keep it from the jury or that the error was harmless. Staniforth is entitled to a new trial on Count I.

In illustrating the riskiness of borrowing on margin we assumed that Staniforth would not respond to the broker's margin

calls, that is, would not put up extra money to maintain the equity cushion without any sale of stock. In the hypothetical case in which the value of the stock fell by 10 percent, Staniforth could pay down the broker's debt from $455,000 to $410,000 and then the broker wouldn't have to sell any of his stock. But to do this Staniforth would need cash, and that brings us to the second count in the indictment.

■ In December 1986, some five months after the renewal of the $36,000 note, Staniforth received a $60,000 margin call from his broker, prompted by a fall in the market value of Possis stock. Staniforth now owed the bank a total of $60,000 and he wanted to borrow another $60,000 to meet the margin call, but—he concedes—he didn't tell Brunner what he needed the additional money for. Brunner asked him to sign a Federal Reserve Form U-1, which is required to be completed when a bank extends credit secured by "margin stock," defined in the Federal Reserve Board's Regulation U not as stock bought on margin but as the classes of securities that banks are permitted to secure loans with. 12 C.F.R. § 221.2(h). The form asks whether any of the credit being extended by the bank is to be "used to purchase or carry margin stock." To this Staniforth answered "no." However, the next line in the form directs that if the answer is "no" the "specific purpose of the credit" be explained—and here Staniforth wrote, "Purchase Stock."

Count II charges that Staniforth made a false statement that he was not seeking money to carry margin stock. The false statement is the "no" on the form to which we have just referred. Staniforth argues that while the answer is indeed false and, standing alone, material, it could not have been made with the purpose of influencing the bank, because right below it he acknowledges that he wants the loan in order to "purchase stock," and purchasing stock and purchasing margin stock are essentially synonyms given the broad definition of "margin stock" in Regulation U. To this the government replies that by "margin stock" Brunner as well as Staniforth un-

derstood "stock bought on margin" and that Staniforth should not be permitted to worm his way out of prison on the basis of "the obscure, technical definition tucked away in the Code of Federal Regulations." The reply does not hit the bull's eye, because the definition also appears at the top of Federal Reserve Form U-1. Still, the government's argument has merit.

Purchasing stock and meeting a margin call are not synonyms. Staniforth by answering "no" to the question whether he wanted the loan in order to purchase or carry margin stock and by then listing the purpose of the loan as being the purchase of stock may have led Brunner to think that he was going to use the loan to buy new stock. If he had 'fessed up that he needed the money to meet a margin call this might have clued Brunner in to the fact that Staniforth had five months earlier concealed his liability to his broker. It would in other words have revealed that Staniforth's stock holdings were encumbered by a lien, that of the broker, which was prior to any security interest the bank might acquire in the stock. Thus, although the form does not ask directly about margin calls or purchases on margin—it is a form about marginable rather than about margined stock—the government's interpretation, that Staniforth, in saying he wasn't seeking the additional $60,000 loan to purchase or carry margin stock, intended to be understood as not seeking the money to buy stock on margin or meet a margin call, is plausible and supported by the evidence.

■ Staniforth argues, however, that Judge Crabb prevented him from introducing evidence that Brunner's bank, although not a member of the Federal Reserve System, was required to comply with Regulation U. Brunner had testified to an understanding of "margin stock" different from the definition in the regulation and the form—how could that be, Staniforth wanted to put to the jury rhetorically, if Brunner was required to comply with Regulation U? The issue was important because the judge had instructed the jury, without objection from the government, that it

could convict Staniforth only if it found that both he and Brunner understood "margin stock" to mean stock purchased on margin.

Staniforth's lawyer was off the track, however, in wanting to place before the jury *evidence* that Brunner was required to comply with the regulation and therefore presumably knew what margin stock really was. Brunner's bank either was or was not subject to the regulation and this is, in the first instance anyway, a question of law, not a matter for evidence. Regulation U provides that for purposes of the regulation "bank" has the same meaning as in 15 U.S.C. § 78c(a)(6). We go to that statute and discover that it means national banks, banks that belong to the Federal Reserve System, and (in subsection (C)) "any other banking institution, whether incorporated or not, doing business under the laws of any State or of the United States, a substantial portion of the business of which consists of receiving deposits." See also *American Bankers Ass'n v. SEC*, 804 F.2d 739, 744 and n. 11, 752 (D.C.Cir.1986). From the name "Community State Bank" it seems highly likely that Brunner's bank meets this undemanding criterion. Staniforth's lawyer may have wanted to nail down the point with evidence that a substantial portion of the Community State Bank's business was, in fact, during the relevant period the receipt of deposits, but he was wrong to want to put such evidence before the jury. Far more clearly than the question of materiality, the question whether the Community State Bank was subject to Regulation U was a question of law for the judge. The lawyer gave the impression of wanting to encumber the trial with a technical inquiry of only marginal relevance into the applicability of Regulation U. And marginal (the pun is unavoidable) it was because no one doubts that the Possis stock is margin stock so that Staniforth's answer to the question on the form whether he was borrowing money to purchase or carry margin stock would still have been false, and the further representation that the purpose of the loan was to purchase stock (not to answer a margin call) still misleading. The only utility of the evidence would have been to lay a foundation for impeaching Brunner's testimony by arguing that he must (contrary to that testimony) have known what "margin stock" meant in Regulation U since his bank was subject to that regulation. The judge was entitled to balance the probative value of conducting such an inquiry in front of the jury (as the lawyer insisted it be done) into the applicability of the regulation against its probable effect in confusing the jury, and to conclude that the "evidence" should be excluded.

The bizarre aspect of all this is that, in fact, Brunner *was* asked on cross-examination whether his bank was subject to Regulation U and he answered—yes. So Staniforth's lawyer had everything he needed to impeach Brunner's testimony, and presentation of evidence on the point would have been superfluous. In light of this we don't understand what the fuss is about, but we certainly don't think that there was reversible error.

■ In August 1987 the market value of Possis stock plunged 50 percent in one day on the basis of a rumor that later proved to be false, and Staniforth's broker issued a margin call that exceeded the market value of his stock. On September 25, Staniforth, in the course of seeking to renew his bank loans, now totaling $85,000, signed a note which states that "The Bank has or will acquire a security interest in ... Stock." (The word "Stock" was typed in, the other words being preprinted on the note form he signed.) This statement is the basis of Count III. Staniforth was unable to meet his broker's margin calls, so on September 29, four days after the signing of the note, the broker liquidated Staniforth's account. The government argues that the statement we have quoted was false because "his representation that the stock was a valuable asset which the bank could count on a security for the loan was grossly inaccurate, as the defendant well knew."

We do not understand how the bare statement that "The Bank has or will acquire a security interest in ... Stock" could be understood as a representation that Sta-

niforth was giving the bank a security interest in a valuable asset. There is nothing about the stock being "valuable." If Staniforth's margin account had already been liquidated, the statement would have been false. He would no longer have owned the stock. But that was four days in the future. At the moment he had an asset. And (if that matters) not a valueless one. Possis was not bankrupt. It was the victim of a false rumor. If within the next four days its stock had bounced back to its previous level (which in fact it didn't do until January 15 of this year, and it's since plummeted again), the broker would not have liquidated the account and the bank would have had a security interest in a valuable, though still encumbered, asset. This point is underscored by the fact that the broker in violation of its own rules (as well as federal regulations) gave Staniforth a month to meet the margin call.

Here, unlike the situation with Count II, there is no evidence that the parties attached a private meaning to the word "stock"—meant by it unencumbered stock or stock in which the borrower had a substantial equity interest. The statement was literally true and there is no evidence that the literal meaning is different from the parties' meaning. The judgment on Count III must be reversed with directions to acquit and the judgment on Count I must be reversed for a new trial, and though we affirm the conviction on Count II and the sentences on all counts were concurrent Dr. Staniforth is entitled to be resentenced on it in light of the vacation of the other two convictions. He makes some other arguments but they are either moot in light of our rulings or insubstantial, and do not require discussion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR RESENTENCING.

JAMES M. BURNS, Senior District Judge, concurring and dissenting.

With regret, I cannot concur in full with Circuit Judge Posner's opinion.

I concur in reversal of Count I. I concur with the reversal of Count III, but dissent from the portion that directs acquittal.

I concur in the affirmance on Count II, but, under the circumstances, I see no need to complicate matters by remanding for resentencing; I, therefore, dissent from that portion.