**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Russel J. LESPERANCE,**
**Defendant–Appellant.**

No. 92–3318.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 9, 1994.

Decided June 1, 1994.

Lisa T. Warwick (argued), Office of the U.S. Atty., Milwaukee, WI, for plaintiff-appellee.

Jerry B. Kurz (argued) and Kathryn Hall, Hall & Kurz, Chicago, IL, for defendant-appellant.

Before POSNER, Chief Judge, BAUER, Circuit Judge, and NORGLE, District Judge.*

BAUER, Circuit Judge.

On February 25, 1992, a federal grand jury indicted Russel J. Lesperance for willfully falsifying material facts in order to obtain a Small Business Administration (SBA) disaster loan in violation of 18 U.S.C. § 1001. A jury of his peers convicted Lesperance on this charge later that year. The district court sentenced Lesperance to four months imprisonment, four months of home confinement, and two years of supervised release. In addition, although the district court did not fine Lesperance as permitted under the Sentencing Guidelines, it did order Lesperance to make restitution to the SBA. Lesperance appeals both his conviction and the district court's order of restitution. We affirm.

## I. Facts

As a result of flooding in early August 1986, Milwaukee, Wisconsin was declared a federal disaster area. The SBA, operating under the aegis of the Federal Emergency Management Agency, offers low interest loans to qualifying homeowners and businesses harmed by a disaster to enable these borrowers to repair the damage wrought by the disaster. In late August 1986, United Research Center, Inc. (URC), through Russel Lesperance as president, applied for such a loan. The stated purpose of the loan was to finance repairs on a residential rental property, consisting of a six-unit building and a duplex, owned by URC.

Prior to granting the loan and during the course of managing the disbursement of the proceeds of the loan, the SBA conducted several inspections of the property to ascertain the extent of the necessary repair work and to verify its actual performance. Loss verifier Troy Dale Stagner performed the first such inspection and determined that the property required over $22,000 worth of repairs. Stagner determined that the heating units in the duplex should be replaced. In addition, he noted that the heating units in the six-unit building should be replaced, but was told by Lesperance, who accompanied Stagner on the inspection, that central heating units need not be installed in the six-unit building because heating units had been installed in the individual units prior to the flood.

* The Honorable Charles R. Norgle, Sr., United States District Judge for the Northern District of Illinois, is sitting by designation.

The SBA initially denied URC's application for a loan due to its questionable credit. In response, URC reorganized in late October 1986 and named Mark Lesperance, Russel's son, president. Russel Lesperance was named secretary. Subsequently, the SBA approved URC's loan.

The loan authorization and agreement, dated December 22, 1986, was signed by Mark Lesperance, president, and Russel Lesperance, secretary, and authorized a loan in the amount of $22,400. The loan authorization was based upon Stagner's assessment of the cost to repair the damages to the property wrought by the flood. A provision in the agreement permitted an alteration of the loan amount if later inspections revealed more or less damage. The loan also required URC to obtain itemized receipts and contracts for all work financed by loan funds.

In accordance with the loan agreement, Lesperance, as URC's secretary, sent a letter dated January 7, 1987, to the SBA stating that the repairs had been made and that URC had paid ninety percent of the amount due. Lesperance included with the letter four lien waivers totaling $22,900. These lien waivers were signed by four contractors who apparently had performed the repairs.

Soon after sending the letter, Lesperance contacted the SBA to request a disbursement of his loan. The SBA informed Lesperance that a disbursement could not be made until outstanding taxes were paid. Lesperance responded that he had used money earmarked for taxes to pay the contractors making repairs. Based on Lesperance's statement and the lien waivers, the SBA agreed to issue two checks jointly payable to URC and the taxing body in the amount of $6,400. After the disbursement, the SBA received another letter from Lesperance dated January 27, 1987, to which a borrower's disbursement certification was attached. The borrower's disbursement certification submitted by Lesperance stated that the repairs were completed and that the contractors had been paid. The SBA noticed that one of the contractors named was Lesperance Associated Contractors, Inc.; sensing a possible impropriety, the SBA ordered an inspection to verify that the repairs had been made and the contractors paid.

In February 1987, Stagner conducted another inspection of URC's property. At this inspection, Lesperance told Stagner that individual furnaces were placed in the individual units after the flood in the six-unit building; Stagner consulted his prior report and determined that Lesperance had told him otherwise. Lesperance also told Stagner that the furnaces in the duplex had been replaced; upon inspection, Stagner believed that Lesperance had not replaced those furnaces. Suspecting something strange afoot, Stagner requested some proof of payment on the lien waivers from Lesperance, who told him that no check payments had been made. Finally, Stagner concluded that only $3,900 worth of repairs had been made at that point and filed his report with the SBA office.

On March 6, 1987, Lesperance, as URC secretary, sent another letter to the SBA in which he detailed contracts between URC and four contractors and articulated the work these contractors had performed. Lesperance attached to the letter the contracts, all dated August 9, 1986, and signed by Russel J. Lesperance as URC's secretary. These contracts indicated some sort of bartering arrangement between URC and the contractors by which URC promised the contractors' services or the use of certain land owned by URC in return for the repair work. The purpose of this letter was to dispel the SBA's concerns of possible improprieties and to induce the SBA to disburse the balance of the loan amount. Although the SBA continued to receive letters from URC, it communicated to Lesperance that it would make no further disbursements until URC complied with the terms of the loan agreement.

At the urging of Lesperance (and, according to the government, a Wisconsin Senator), the SBA agreed to perform another loss verification of the property. Stephen Andruzak inspected the property for the SBA and was told by Lesperance that he was forced to install individual heating units in each unit of the six-unit building because the flood had damaged the central heating units in the basement. Failing to note the section in Stagner's report to the contrary, Andruzak

reported that Lesperance's loss was greater than originally determined and recommended an increase in URC's loan. Based on Andruzak's report, the SBA agreed to increase the amount of the loan to approximately $30,000 and disbursed $10,000 to URC.

Despite ongoing correspondence between URC and the SBA, URC failed to provide any receipts for repair work actually performed. The SBA then ordered another on-site inspection to verify that all repairs had been or would·be made in accordance with the authorized use of the loan proceeds. Robert McCubbins and Robert Raniewics, two experienced field personnel, performed this final inspection on December 17, 1987. These two men determined that very little repair work had been done, estimating the value of this work to be approximately $4,000. Consequently, McCubbins recommended that the SBA reduce the loan to $16,400, the amount already disbursed, and close URC's file. The SBA adopted McCubbins's recommendation, canceled URC's loan, and denied URC's subsequent appeal.

## II. Analysis

A jury convicted Lesperance on one count of willfully falsifying material facts in order to obtain an SBA disaster loan disbursement. Lesperance first argues that the government's evidence is insufficient to prove the crime with which he was·charged.

The burden of demonstrating that the government's evidence is insufficient to support a conviction is "nearly insurmountable." *United States v. Teague,* 956 F.2d 1427, 1433 (7th Cir.1992). We review the evidence in a light most favorable to the government, drawing all reasonable inferences. The evidence is sufficient if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In this case, the government's case is more than sufficient to support Lesperance's conviction.

Lesperance makes the specific argument that the government failed to prove that he knowingly made false statements to the SBA. He claims that Jerry Lesperance, Russel's nephew and essentially the property's superintendent, was responsible for the repair work and the dealings with the contractors. As a result of this delegation of authority, Russel Lesperance claims he never knew that the necessary repairs had not been made on URC's property until the time of the trial. Further, he claims that none of his dealings with the SBA implicates him in a scheme to knowingly misrepresent the status of the repairs to the property.

The evidence presented by the government, however, paints a different picture. The government argued to the jury that Russel Lesperance was a scheming conniver intent on defrauding·the SBA and that, at every turn, Lesperance did whatever was necessary to convince the SBA that he was actually going to use the proceeds of his disaster loan to repair URC's property. The jury believed the government's argument, and a review of the government's evidence demonstrates why.

Andrea Fulton, an SBA employee, testified that when Lesperance requested the first disbursement, she informed him that the property's outstanding tax liability must be paid. Lesperance responded that he had used the money that he had set aside to pay the taxes to pay the contractors for repairs. The evidence demonstrated that this statement was a lie. Fulton and her supervisor testified that this statement, together with the lien waivers, induced the SBA to disburse funds to pay the outstanding taxes.

All four investigators also testified. Each stated that very little, if any, repair work had been done to the property. This is not surprising; each contractor testified that it had done no flood-repair work on the URC property. In addition, verifiers Stagner and Andruzak testified that Lesperance lied regarding the heating units. Further, Lesperance did not provide receipts to any of the investigators of payments to contractors for repairs made on the buildings. For that matter, each representative of the SBA testified that Lesperance never provided receipts of any kind.

The closest Lesperance came to providing receipts were the lien waivers purportedly signed by the contractors. These had the effect, albeit temporarily, of leading the SBA to believe that work had been done. Russel

Lesperance admitted that he drafted these lien waivers and instructed Jerry Lesperance to have them signed. One contractor testified that he signed it as a favor to Jerry. Another testified that his signature had been forged. While these lien waivers did not specifically state that the work was done and the contractors paid, the borrower disbursement statement did. Clearly, this statement was false.

The government also highlighted irregularities with the contracts between URC and the contractors. Two contractors stated that they would never have used such a contract because each uses its own form contract. Another contractor claimed he had never seen the contract and that his signature had been forged. In addition, while the contracts are all dated August 9, 1986, they are all signed by Russel Lesperance as *secretary* of URC. URC did not reorganize and reposition Lesperance from president to secretary until October 1986. The government argued that Lesperance had created these contracts in 1987 when it became clear to him that the SBA sensed something amiss with his loan; it claims that Lesperance backdated the contracts, forged certain contractors' signatures, and made peculiar mistakes that would not have been made had the contracts been executed on the date they bore. It also argued that Lesperance created the lien waivers for a similar purpose.

All these factors contribute to a finding that Lesperance deliberately lied to the SBA to induce it to disburse proceeds of the loan to him. Lesperance knew that he had never paid the contractors, but represented otherwise to the SBA. In addition, there is evidence that he accompanied investigators during their inspections. A jury could reasonably infer that during these inspections, Lesperance himself should or could have determined that no work had been done; the loss verifiers told him at least that much. There is also evidence that Lesperance phonied paperwork to support his case with the SBA. Lesperance's knowledge of the falsehoods perpetrated upon the SBA is well-supported by the government's evidence, and any role that Jerry Lesperance played in this production was that of marionette to Russel Lesperance's puppeteer.

Lesperance's second argument is that the district court erred in deciding that the falsified facts were material; he claims that the issue of materiality is one of fact and is, therefore, the province of the jury, not the judge. Lesperance acknowledges that the current law of this circuit is that materiality is a question of law. He urges, however, that our opinion in *United States v. Staniforth,* 971 F.2d 1355 (7th Cir.1992), indicates that we are prepared to adopt a contrary position and invites us to align our thinking on this matter with the Ninth and Tenth Circuits who hold materiality to be a question of fact. We do not adopt Lesperance's characterization of *Staniforth* and decline his generous invitation.

Unquestionably the law in this circuit is that, under 18 U.S.C. § 1001, materiality is a question of law to be determined by the judge. *United States v. Bullock,* 857 F.2d 367 (7th Cir.1988). This position is consistent with *Kungys v. United States,* 485 U.S. 759, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1987). In *Kungys,* the Court considered the materiality requirement of an immigration statute. It stated that materiality under § 1001 is a question of law and, by analogy, held that materiality under the immigration statute is also a question of law. *Id.* at 772, 108 S.Ct. at 1547. Nothing has transpired since those decisions were rendered to move us from this position. *See Moser v. United States,* 18 F.3d 469 (7th Cir.1994).

In *Staniforth,* we considered a case of materiality under 18 U.S.C. § 1014, a different statute, where the defendant was convicted of falsifying facts to a federally insured bank. There, drawing on *Kungys,* we noted the possible difference between the effect of making a false statement to the government and the effect of making one to a bank. *Staniforth,* 971 F.2d at 1358. In the former case, materiality depends on the statutes and regulations defining governmental powers and duties and is therefore a question of law, while in the latter case materiality may also or instead involve issues of business judgment and may therefore be a question of fact, though we found it unnecessary to re-

solve that issue. *Id.* at 1358–59. Our decision in *Staniforth,* then, has no bearing on materiality under § 1001. It is a question of law, and the district court properly reserved the issue for itself.

Finally, Lesperance argues that the district court erred when it failed to consider his indigency in ordering him to make full restitution to the SBA. He claims the evidence of his poverty is so overwhelming that the district court must have ignored it in its decision making. In attacking the district court's decision to order restitution, Lesperance must establish that in making this determination, the court abused its discretion. *United States v. Celani,* 898 F.2d 543, 544 (7th Cir.1990).

▮ In determining whether to order restitution under 18 U.S.C. § 3663 and the amount of such restitution, a district court may order restitution only after it has considered the amount of loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate. 18 U.S.C. § 3664. Although the statute requires the district court to make findings on the record, this requirement is only applicable when the court refuses to order full restitution. *See* 18 U.S.C. § 3553(c); *United States v. Arvanitis,* 902 F.2d 489, 496 (7th Cir.1990) (collecting cases). "Here, the court ordered full restitution and thus was not required to make explicit findings of fact regarding the statutory factors." *Arvanitis,* 902 F.2d at 496.

▮ In this case, though, the record is clear enough to demonstrate that the district court considered Lesperance's financial condition and properly exercised its discretion. The district court adopted the undisputed findings in the pre-sentence report. This report detailed Lesperance's financial condition and indicated that he had a negative net worth and a monthly cash flow of zero. Further, the record reflects that the district court considered Lesperance's financial condition by stating in the judgment: "Fine is waived because of the defendant's inability to pay." In addition, the district court stated that it was aware of Lesperance's health problems in sentencing him to the minimum period of incarceration and accommodating his request to serve the last half of the sentence in home confinement. The record, then, demonstrates that the district court complied with its obligation to consider the mandatory factors prior to ordering restitution.

Having determined that the district court possessed the necessary information, we conclude that it did not abuse its discretion in ordering restitution. "The statute contemplates the imposition of full restitution whenever possible, ... and the burden falls upon the defendant to demonstrate that because of his particular circumstances, full restitution is unwarranted." *Arvanitis,* 902 F.2d at 496 (citations omitted). The only argument Lesperance has raised is indigency. Indigency is not a defense under the restitution statute, it is only a factor the court is required to take into account. *United States v. Nelson,* 5 F.3d 254, 258 (7th Cir.1993) (citing *United States v. Boula,* 997 F.2d 263, 268 (7th Cir. 1993)); *Arvanitis,* 902 F.2d at 497 (citing cases). While Lesperance, like the defendant in *Nelson,* has a negative net worth, he does have some business interests to which he can return. So, despite his health problems, we believe Lesperance can make the restitution over time as ordered by the district court. In any event, we do not find it an abuse of discretion to require Lesperance to return to the SBA his ill-gotten gain.

### III. Conclusion

For the foregoing reasons, Lesperance's conviction and the district court's order of restitution is

Affirmed.